Filed 1/30/18 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE, | C081813 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F00551) |
| v. | ORDER MODIFYING OPINION ON TRANSFER AND CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| MONTRELL WOODS, | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion on transfer filed herein on January 26, 2018, be modified as follows:

Change the opinion on transfer from a published opinion to a partially published opinion and add the following footnote to the heading "CERTIFIED FOR PARTIAL PUBLICATION." "* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I through VIII of the Discussion."

There is no change in the judgment.

BY THE COURT:

 /s/ 
Robie, Acting P. J.

 /s/ 
Duarte, J.

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>MONTRELL WOODS,<br><br>     Defendant and Appellant. | C081813<br><br>(Super. Ct. No. 14F00551)<br><br>OPINION ON TRANSFER |

APPEAL from a judgment of the Superior Court of Sacramento County, Allen H. Sumner, Judge.  Affirmed.

Joseph Shipp, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and F. Matt Chen, Deputy Attorneys General, for Plaintiff and Respondent.

At the age of 19, defendant Montrell Woods shot Kenny Hernandez to death during a confrontation between the two men at an apartment complex.  A jury found defendant guilty of second degree murder and of being a felon in possession of a firearm and also found he personally discharged a firearm causing death.  The trial court

sentenced defendant to a term of 15 years to life for the murder and to a consecutive term of 25 years to life for the firearm enhancement under Penal Code section 12022.53. At the time of defendant's sentencing, the enhancement statute provided that "[n]otwithstanding [Penal Code s]ection 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section." (Former Pen. Code, § 12022.53, subd. (h).)

On appeal, defendant argues the trial court erred by failing to bifurcate the possession of a firearm charge from the murder charge, the court erroneously excluded evidence of the victim's propensity for violence, the prosecutor committed two acts of misconduct, the court committed multiple instances of instructional error, and cumulative error resulted. Defendant also argues that his case must be remanded to the trial court so that he can make an adequate record for a future youth offender parole hearing and so that the trial court can exercise its discretion as to whether to strike the firearm enhancement based on a recent change to Penal Code section 12022.53 that took effect on January 1, 2018.

In the unpublished portion of our opinion, we find no merit in defendant's claims of trial court error and prosecutorial misconduct. In the published portion of our opinion, we conclude that defendant already had sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing, but we agree that remand is necessary to allow the trial court to exercise its discretion as to whether to strike the firearm enhancement under the recent amendment to Penal Code section 12022.53.

FACTUAL AND PROCEDURAL BACKGROUND

On January 22, 2014, defendant shot Kenny Hernandez to death during a confrontation between the two men at an apartment complex. Three witnesses gave varying accounts of the shooting to law enforcement officers after the incident and at defendant's murder trial.

2

Hernandez's cousin, Claudia Pena, testified that on January 22, she, Hernandez, and his mother, Marta Garcia, were moving items Pena had stored for them from her second story apartment to the apartment the two recently moved into in the same apartment complex.  During one of their trips, Hernandez walked down the stairs with a small table and boxes, and Pena walked behind him with two chairs.  Garcia was behind Pena, also carrying some items.  When Hernandez got to the bottom of the stairs, defendant came up fast on a scooter and hit Hernandez near his waist with the handlebar of the scooter.  Pena testified that Hernandez told defendant in English, "Hey, be careful.  Hey, be careful.  You could hit a baby."  Defendant then threw down his scooter, walked up to Hernandez, and used racial slurs.  Hernandez put down the items he was carrying and responded, "What's your problem?  I'm just telling you to be careful."  Defendant then shot Hernandez once in the chest killing him.

In contrast to Pena's trial testimony, Sacramento County Deputy Sheriff Ryan Cervetti testified that after the murder Pena told him both defendant and Hernandez were yelling and cursing at each other before defendant shot Hernandez.

Garcia testified that defendant crashed into Hernandez with his scooter, and then Hernandez said something to defendant.  Garcia did not completely understand what Hernandez said because it was in English, but she thought Hernandez told defendant to be careful.  Defendant said something back to Hernandez that Garcia did not understand and then threw down his scooter.  Defendant then walked toward Hernandez causing Hernandez to put down the items he was carrying.  Hernandez did not say anything to defendant.  Defendant said something else to Hernandez and then shot him.  Throughout the whole incident, Hernandez did not appear angry but spoke loudly.

In contrast to Garcia's trial testimony, Sacramento County Deputy Sheriff Alex Lopez testified that after the murder Garcia told him defendant brushed up against Hernandez at the bottom of the stairs with his scooter.  Defendant made "vulgar comments" to Hernandez, which made Hernandez angry and he "exchange[] words" with

3

defendant before defendant shot him. Sacramento County Deputy Sheriff Juan Hidalgo testified that Garcia told him Hernandez and defendant exchanged words she did not understand, but she thought it was "an initiation of a fight." Garcia also told him that the two yelled at each other and that Hernandez "was going to go after [defendant] when this happened."

Defendant's mother, Linda Ellis, who also witnessed the incident, testified that as she walked down the stairs to take out the trash, she saw her son talking with a black man at the bottom of the stairs across from her. She had never seen the black man before but described him as being 23 or 24 years old with dreadlocks or braids and wearing a hat and a coat. Ellis also saw Hernandez throw trash bags down from the apartment above where defendant and the black man were standing. Hernandez then walked down the stairs with a bag and bumped into both defendant and the black man. Defendant told Hernandez to "watch out," and Hernandez responded, "What you say you bitch-ass nigger?" Hernandez then became enraged and ran toward defendant. Hernandez punched defendant in the face and backed him into a corner where defendant crouched down and shielded his face. Hernandez then kicked defendant three or four times in his face. Hernandez then suddenly fell into a nearby barbeque pit and did not get up. The black man left the area after Hernandez fell into the barbeque pit.

In contrast to Ellis's trial testimony, Sacramento County Sheriff's Detective Pam Linke testified that Ellis told her defendant and Hernandez argued and fought and that her son pushed Hernandez into a barbeque. Ellis never said Hernandez hit defendant or that there was a black man present for the fight. Following the incident, defendant did not have any injuries, bruises, or bleeding to his face, neck, or arms.

Defendant was 19 years old at the time of the murder. He was five feet two inches tall and suffered from an intellectual disability. Dr. Jeffrey Miller, a clinical psychologist, administered an IQ test to defendant, which determined his ability to intellectually function by testing his memory, thinking, and reasoning skills. Overall,

4

defendant scored a 58, which placed him in the mild range of intellectual disabilities. A score below 70, however, constitutes a severe disability in terms of a person's ability to function on a daily basis. Because of defendant's disability, he learns at a very slow rate and is slow to understand and respond to external acts. Defendant functioned in life as a nine- to 11-year-old child would function.

At the time of his death, Hernandez was 5 feet 10 inches tall and weighed 188 pounds. Defendant sought to admit evidence of Hernandez's violent and aggressive character based on a police report that included statements from Garcia. According to the police report, Garcia told officers that Hernandez had been in a fight a month before his death with a group of black men who tried to "jump" him. He told the group, "[l]et's go one-on-one," which led to a fight between the biggest man in the group and Hernandez. Garcia also told the officer that her son was a good fighter.

During an Evidence Code section 402 hearing, Garcia testified that a month before the murder, a group of men approached Hernandez in a different apartment complex than the one where he was shot. The biggest man in the group started pushing Hernandez and Hernandez pushed him back. Garcia got in the middle of the men and told her son not to fight. The men then dispersed. Garcia stated that her son was not the type of person who was involved in street fights or made disparaging comments about black people. She also did not remember telling officers that her son was a "good fighter." The trial court excluded this evidence because it did not show Hernandez had a propensity for violence and because it would constitute an undue consumption of time and potentially confuse the jury.

Before trial, defendant moved to exclude his 2013 felony conviction for possession of cocaine base. The court stated that it would not rule on the issue until it came up at trial because the court's decision depended on whether the parties stipulated that defendant had been convicted of a felony. The trial court noted that even with a stipulation, the fact of defendant's felon status would still be presented to the jury. The

5

issue was never addressed again and the prosecution admitted defendant's certified record of conviction to prove that he was previously convicted of a felony. During the prosecution's rebuttal closing argument, the prosecutor argued defendant's plea agreement wherein he indicated that he understood the extent of his plea showed his mental impairment defense was unavailing. The prosecutor also stated that defense counsel "talk[ed] trash" and "[could not] back it up" after defense counsel argued the jury should convict defendant of voluntary manslaughter, but then also argued he did not commit the murder at all.

Among other instructions, the court instructed the jury on first and second degree murder, voluntary manslaughter based on heat of passion and imperfect self-defense, complete self-defense and the related principles of contrived self-defense and mutual combat, and mental impairment. The court did not instruct, nor did defense counsel request the jury be instructed, on involuntary manslaughter. Further, defense counsel did not request modification to the court's instructions, except to request that the jury be told it could consider defendant's mental impairment for the purpose of the objective component of the complete self-defense instruction. The trial court denied defendant's request, finding it was not supported by the law.

At sentencing, the trial court indicated it had reviewed defendant's 11-page probation report. Defense counsel stated he did not have anything to add to the report and that it contained no errors or omissions. Defense counsel also indicated he did not file any other documents with the court and that he had nothing to say before judgment was entered because the "probation report notated the mitigating factors that [he] would bring up." The court then sentenced defendant to a term of 40 years to life for murder and the associated gun enhancement and imposed a concurrent two-year term for being a felon in possession of a firearm.

6

DISCUSSION

I

*Defense Counsel Was Not Ineffective For Failing To Request Bifurcation Or*

*Severance Of Defendant's Possession Of A Firearm Charge*

Defendant contends the trial court erred when it failed to bifurcate or sever his charge for being a felon in possession of a firearm. Defendant did not request bifurcation or severance at trial but argues on appeal that this issue is not forfeited because the trial court should have construed his motion to exclude evidence of his prior conviction as a motion to bifurcate or sever. In the event we reject that argument, he also argues his counsel was ineffective for failing to request his possession of a firearm charge be bifurcated or severed from his murder charge. We conclude these issues were forfeited because defense counsel failed to request bifurcation or severance in the trial court. We also conclude defense counsel was not ineffective for failing to request bifurcation or severance.

A trial court does not have a sua sponte duty to order severance or bifurcation. (*People v. Rogers* (2006) 39 Cal.4th 826, 850-851 [severance]; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1050 [defendant bears the burden to show bifurcation should be granted].) Since defendant did not move to sever or bifurcate the possession charge, the issue is forfeited. (*People v. Fuiava* (2012) 53 Cal.4th 622, 653 [issue not raised below is forfeited].)

Defendant argues, however, that the trial court should have construed his broad request to exclude his prior felony as a motion to bifurcate or sever. By failing to do so, defendant argues, the trial court did not "exercise informed discretion."

Defendant moved only to exclude evidence of his prior conviction, and he never secured a ruling on that issue nor informed the court he wished to stipulate to his prior felony conviction. Thus, even if we treat defendant's motion to exclude evidence as a motion to sever or bifurcate, he failed to preserve the issue because he never pressed the

7

trial court for a ruling. (*People v. Cunningham* (2001) 25 Cal.4th 926, 984 [failure to press trial court for ruling on motion to sever waives the issue on appeal]; *People v. Pinholster* (1992) 1 Cal.4th 865, 931 [same], disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

Defense counsel's failure to request bifurcation or severance also was not excused by the futility of an objection, as defendant argues. After defendant requested to exclude evidence of his prior conviction, the court stated it would "leave that as to come," clearly indicating it would be willing to address any issue regarding defendant's prior conviction defendant sought to raise. Nothing in the trial court's statements indicated that it would not entertain a motion to sever or bifurcate.

Neither will we address defendant's claim based on his assertion he was denied due process and a fair trial. Defendant's murder charge and felon in possession charge were properly joined under Penal Code section 954 because they pertain to the same class of assaultive crimes (*People v. Thomas* (1990) 219 Cal.App.3d 134, 140) and were connected in their commission. Further, defendant's prior felony conviction was presented through admission of his certified record of conviction. No witness testified about defendant's conviction and no time was spent during trial relating the facts of defendant's prior crime. The jury was further instructed about the permissible uses of this conviction -- that it could use defendant's felony conviction only to determine whether he was a felon for the purpose of the felon in possession charge. Thus, there is no indication defendant was denied a fair trial by his counsel's failure to move to bifurcate or sever the felon in possession charge.

Further, defense counsel's failure to request bifurcation or severance was not excused due to the "unsettled" state of the law, as he suggests, because the law is not unsettled. As it pertains to bifurcation, trial courts do not have the discretion to bifurcate a charged offense when a prior conviction is an element of that offense. "When a prior

8

conviction is an *element* of a charged offense . . . the Supreme Court has not required or condoned bifurcation." (*People v. Profitt* (2017) 8 Cal.App.5th 1255, 1267.)

In *People v. Valentine* (1986) 42 Cal.3d 170, 181-182, the Supreme Court held that the state Constitution requires proof of the fact of exfelon status when that status is an element of a current charge. The court also rejected the defendant's argument that a trial court could bifurcate trial of exfelon status from trial of the other elements, stating that this proposal was inconsistent with the voters' intent when enacting section 28, subdivision (f) of article I of the California Constitution, which provides that "[w]hen a prior felony conviction is an element of any felony offense, it shall be proven to the trier of fact in open court." (*Valentine*, at p. 173.)

Then, in *People v. Sapp* (2003) 31 Cal.4th 240, "the Supreme Court rejected a contention that *Valentine* authorized bifurcation of *related charges* where a prior conviction was an element of one of the charges." (*People v. Profitt*, *supra*, 8 Cal.App.5th at p. 1268, citing *Sapp*, at pp. 260-262.) In *Sapp*, the defense sought to bifurcate the felon in possession charge and have it tried to the court instead of the jury. The *Sapp* court rejected this contention and explained as follows: "*Valentine*, *supra*, 42 Cal.3d 170, allows the trial court *only* two options when a prior conviction is a substantive element of a current charge: Either the prosecution proves each element of the offense to the jury, or the defendant stipulates to the conviction and the court 'sanitizes' the prior by telling the jury that the defendant has a prior felony conviction, without specifying the nature of the felony committed." (*Sapp* at p. 262, italics added.)

Based on this authority, the trial court did not have the discretion to bifurcate defendant's felon in possession charge from his murder charge. For this same reason, defense counsel was not ineffective for failing to request bifurcation of defendant's felon in possession charge. (See *People v. Pierce* (2015) 234 Cal.App.4th 1334, 1337 [failure to raise a meritless objection is not ineffective assistance of counsel].)

Other than in dictum, neither *Valentine* nor *Sapp* addressed a trial court's authority to sever a felon in possession charge from other charges brought in an accusatory pleading. (*People v. Sapp*, *supra*, 31 Cal.4th at pp. 261-262; *People v. Valentine*, *supra*, 42 Cal.3d at p. 180, fn. 3.) However, trial courts have entertained such motions (see *People v. Merriman* (2014) 60 Cal.4th 1, 43, fn. 7; *People v. Gomez* (1994) 24 Cal.App.4th 22, 26; *People v. Thomas*, *supra*, 219 Cal.App.3d at pp. 139-141; *Walker v. Superior Court* (1974) 37 Cal.App.3d 938, 940-943), showing the law is quite settled that a defendant may do so.

In any event, defense counsel was not ineffective for failing to request the court sever defendant's felon in possession charge from the murder charge. " 'To establish ineffective assistance, defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him.' " (*People v. Hernandez*, *supra*, 33 Cal.4th at pp. 1052-1053.) Further, " 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 982.)

Here, defendant cannot show prejudice. As we have previously noted, defendant's murder charge and felon in possession charge were properly joined under Penal Code section 954. The charges pertain to the same class of assaultive crimes (*People v. Thomas*, *supra*, 219 Cal.App.3d at p. 140), and the felon in possession charge involved many of the same facts as the other charged crime and took place at the same time (cf. *Walker v. Superior Court*, *supra*, 37 Cal.App.3d at pp. 940-943 [refusal to grant a motion to sever felon in possession charge was an abuse of discretion when gun discovered near

10

defendant 106 days after the other crimes charged were committed]).  Further, defendant's prior conviction was for possession of cocaine base, a crime unrelated to and far less egregious than murder.  It is not likely a jury would convict defendant of murder simply because he possessed cocaine base a year before the murder took place.  (See *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)  Because the charges were properly joined under Penal Code section 954 and there was limited potential for prejudice, it is not reasonably likely the trial court would have granted a motion to sever defendant's possession of a firearm charge had defense counsel requested it.  Thus, defense counsel was not ineffective for failing to request defendant's felon in possession charge be severed.

II

*The Court Did Not Abuse Its Discretion When Excluding Evidence Of A*

*Prior Altercation Between Hernandez And A Third Party*

Defendant contends the trial court erroneously excluded evidence of Hernandez's "violent/aggressive character" (bolding and capitalization omitted) as shown by Garcia's prior statement to police and her testimony during the Evidence Code section 402 hearing.  Defendant also claims the exclusion violated his rights to due process and to present a defense under the United States Constitution.  We conclude the trial court did not abuse its discretion when excluding this evidence and defendant's constitutional claims are similarly unavailing.

A defendant being prosecuted for homicide or an assaultive offense, and who asserts self-defense, may introduce evidence of specific violent acts by the victim on a third person to show that the victim has a violent character and was the aggressor in the current offense.  (*People v. Wright* (1985) 39 Cal.3d 576, 587)  However, " '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the

11

jury.' " Rulings under this provision "come within the trial court's discretion and will not be overturned absent an abuse of that discretion." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1069, 1070.)

Our Supreme Court has explained as follows: "Section 352 permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption. That section requires that the danger of these evils substantially outweigh the probative value of the evidence. This balance is particularly delicate and critical where what is at stake is a criminal defendant's liberty." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744.) Accordingly, "section 352 must bow to the due process right of a defendant to a fair trial and his right to present all relevant evidence of significant probative value to his defense. [Citations.] Of course, the proffered evidence must have more than slight relevancy to the issues presented." (*People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 599.)

The trial court found limited probative value to defendant's proffered evidence because it did not rise to the level of showing Hernandez had a violent character. The evidence showed Hernandez responded to being "jumped" and "pushed" by pushing his aggressor in return. Then the altercation ceased. There was no evidence showing Hernandez was the aggressor in the fight or that he responded to being pushed in a disproportionally violent manner. From this evidence, it cannot be said Hernandez exhibited a character for violence or even acted violently during this one altercation. Further, the testimony involved a single incident and did not establish a pattern for violence. (See *People v. Stewart* (1985) 171 Cal.App.3d 59, 66 ["series of crimes relevant to credibility is more probative than is a single such offense"]; see also *People v. Muldrow* (1988) 202 Cal.App.3d 636, 648.)

Additionally, presentation of this evidence would have constituted an undue consumption of time, as the trial court noted. The jury had already heard Garcia's and Pena's prior statements impeaching their testimony that Hernandez was not

12

confrontational in the moments leading to his death.  Pena told officers that both Hernandez and defendant were yelling and cursing at each other, while Garcia told officers the two men yelled at each other and Hernandez "was going to go after" defendant.  Presenting evidence of this single altercation to the jury would have necessitated the testimony of not only Garcia, but the officer who took her statement.  This would have consumed additional time while offering minimal probative value to a set of facts the jury already had heard extensive testimony about.

It also would have confused the jury, as the trial court found, because Garcia's testimony was lacking in detail and neither her testimony nor her statement established Hernandez had a violent character.  Based on the evidence and the court's statements, the trial court was well within its discretion to exclude evidence of the single altercation, in which Hernandez was not the aggressor, pursuant to Evidence Code section 352. Similarly, defendant's right to a fair trial and to present a defense was not infringed. (*People v. Snow* (2003) 30 Cal.4th 43, 90 ["[a]pplication of the ordinary rules of evidence, such as Evidence Code section 352, generally does not deprive the defendant of the opportunity to present a defense"].)

III

*It Is Not Likely The Jury Improperly Construed The Prosecutor's Remarks Regarding Defense Counsel, And Defendant Forfeited His Misconduct Claim Regarding The Prosecutor's Remarks About His Prior Conviction*

Defendant contends reversal is warranted because the prosecutor committed two acts of misconduct during the rebuttal portion of his closing argument.  One such instance occurred, he argues, when the prosecutor made disparaging comments about his attorney, the other when the prosecutor improperly argued the jury could consider defendant's prior conviction and plea deal to determine the credibility of his mental impairment defense.  We conclude there was no reasonable likelihood the jury applied the

13

prosecutor's disparaging comments about defense counsel in an objectionable fashion and defendant forfeited his second claim of misconduct for failing to object at trial.

" ' "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." [Citations.] "In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks" [citation], and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion [citation].' [Citation.] 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1336-1337.)

At the start of the rebuttal portion of the prosecutor's closing argument, he criticized defense counsel's closing argument for being inconsistent and irrelevant. The prosecutor concluded by saying, "Let's call a witness doctor, defendant's IQ, blah-blah-blah, blah-blah-blah, blah-blah-blah, blah-blah-blah. What's the relevance? I don't know. My guy didn't do it. [¶] *You see, the problem with* [*defense counsel*]*, he talks trash. He[,] like* [*defendant*]. *He can't back it up.*" (Italics added.) Defense counsel then objected.

During his closing argument, defense counsel argued that defendant did not commit the murder at all but also argued the jury could find defendant guilty of voluntary manslaughter or imperfect self-defense. Accordingly, the prosecutor was entitled to address the matter in closing argument and attempt to convince the jury defense counsel's arguments were inconsistent and unsupported by the evidence. But although a prosecutor is accorded wide latitude in attacking the defense's case (*People v. Gamache* (2010) 48 Cal.4th 347, 390), to the extent the prosecutor here did not simply argue the defense was

unsupported by facts and thus a sham, but that *defense counsel* "talks trash," the argument improperly implied that counsel was personally dishonest. " 'An attack on the defendant's attorney can be seriously prejudicial as an attack on the defendant himself, and, in view of the accepted doctrines of legal ethics and decorum [citation], it is never excusable.' " (*People v. Hill* (1998) 17 Cal.4th 800, 832.) The prosecutor's comments here were improper, as well as disrespectful.

It is not reasonably likely, however, the jury understood or applied the prosecutor's improper comments to defendant's detriment. The prosecutor's impermissible comments were fleeting and occurred after a discussion about the weaknesses in the defense's case. It is clear from the whole of the prosecutor's statements that he was attacking the validity of the defense presented. Accordingly, the prosecutor's comments did not rise to the level of prejudicial misconduct. (See *People v. Seumanu*, *supra*, 61 Cal.4th at pp. 1336-1337.)

Defendant's second allegation of misconduct is also unavailing. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion--and on the same ground--the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) "[O]therwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." (*People v. Price* (1991) 1 Cal.4th 324, 447.) Here, defense counsel did not object to the prosecutor's statements regarding defendant's previous plea agreement and its relation to his mental abilities. He also does not argue that an admonition would not have cured any resulting harm. Thus, he has forfeited his claim that the prosecutor committed misconduct by arguing the jury could consider evidence of defendant's conviction when determining the validity of his mental impairment defense.

Still, defendant urges us to reach the merits of his claim because his attorney was ineffective for failing to object and because he was denied a fair trial because of the

15

prosecutor's statements. We disagree. Defendant did not stipulate to the existence of his prior conviction and the record does not show the court admitted defendant's prior conviction for a limited purpose. The court did, however, instruct the jury that it could consider evidence of defendant's prior conviction *only* for the purpose of determining whether the prosecution proved defendant was previously convicted of a felony. It also instructed the jury to follow the law as explained in the instructions and to disregard the attorneys' comments on the law that conflicted with the instructions. We assume the jury followed these instructions. (*People v. Cook* (2006) 39 Cal.4th 566, 610.) Thus, regardless of the impropriety of the prosecutor's comments, the jury is presumed to have considered evidence of defendant's prior conviction only when determining whether he previously was convicted of a felony. Nothing in the record indicates otherwise; therefore, defendant was not denied a fair trial. For these same reasons, defendant cannot show he was prejudiced by his counsel's failure to object to the prosecutor's comments. (See *Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698] [to prevail on a claim of ineffective assistance of counsel, defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different].)

IV

*The Trial Court Properly Instructed The Jury On The Mental*

*State Required For Voluntary Manslaughter*

Defendant argues the trial court erred in "failing to specify the requisite mens rea for . . . voluntary manslaughter and explain how malice is negated under voluntary manslaughter." (Bolding and capitalization omitted.) He urges us again to reach this issue despite his counsel's failure to object in the trial court. He claims the issue is cognizable because the error implicates his substantial rights and the court had a sua sponte duty to specify the requisite mens rea for voluntary manslaughter and explain its malice-negating properties. Defendant also asserts that his counsel was ineffective for

16

failing to object on these grounds. We disagree. Under our authority of *People v. Genovese* (2008) 168 Cal.App.4th 817, the instructions adequately informed the jury that intent to kill and conscious disregard mental states apply to voluntary manslaughter and that provocation serves to reduce murder to manslaughter. Because the instructions correctly informed the jury on the law, the trial court did not have a sua sponte duty to specify the mens rea element of voluntary manslaughter or explain its malice-negating properties. For these same reasons, defendant's substantial rights were not affected and his counsel was not ineffective.

Here, the jury was instructed as part of the pattern murder instructions (CALCRIM No. 520) that "the People must prove that: One, the defendant committed an act that caused the death of another person; two, when the defendant acted, he had a state of mind called malice of forethought [*sic*]; and three, he killed without lawful excuse or justification. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder." The same instruction included definitions of both express and implied malice aforethought, including conscious disregard for human life. The jury was also given CALCRIM No. 522: "[p]rovocation may reduce a murder from first degree to second degree and may reduce murder to manslaughter. The weight and the significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

The jury was then instructed per CALCRIM No. 570 on voluntary manslaughter in relevant part as follows: "A killing that would *otherwise be murder* is *reduced* to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: One, the defendant was provoked; two, as a result of the

17

provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (Italics added.)

In *Genovese,* the defendant challenged the voluntary manslaughter instruction in the same fashion defendant does now. (*People v. Genovese*, *supra*, 168 Cal.App.4th at p. 825.) The jury in *Genovese* was instructed with the same principles of murder and voluntary manslaughter as defendant's jury was instructed. The *Genovese* jury was told " '[a] killing *that would otherwise be murder* is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.' " (*Id.* at p. 831.) Based on this language the court explained as follows: "The killing could not 'otherwise be murder' unless the jury found defendant intended to kill the victim or acted with conscious disregard for human life, and the jury was so informed in the instruction defining murder (i.e., that to prove murder, the prosecution must prove defendant acted with malice aforethought, and there are two kinds of malice aforethought -- express, which requires intent to kill, and implied, which requires conscious disregard for human life)." (*Id.* at pp. 831-832.) The court rejected the defendant's argument that, once the jury determined express or implied malice was present, it was not told it could still find the defendant guilty of voluntary manslaughter if it believed he acted in the heat of passion. The court noted the plain language of the instructions informed the jury that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant acted on a sudden quarrel or in the heat of passion. (*Id.* at p. 832.)

As in *Genovese*, the trial court here relied on the appropriate pattern instructions to explain to the jury that a killing "that would otherwise be murder" is reduced to voluntary manslaughter if the defendant killed a person during a sudden quarrel or in the heat of passion and that the killing could not "otherwise be murder" unless the jury found the defendant either had intended to kill the victim or acted with conscious disregard for

18

human life.  Further, the jury was told multiple times that the presence of provocation served to reduce murder to voluntary manslaughter.  Therefore, the court's instructions correctly informed the jury that a killing on a sudden quarrel or in the heat of passion, whether intentional or in conscious disregard for human life, is voluntary manslaughter.

Because the jury was correctly instructed about the law, defendant cannot show the court had a sua sponte duty to further explain the mens rea element of voluntary manslaughter and its malice-negating properties or that his substantial rights were affected by the lack of explanation.  Similarly, defendant's counsel was not ineffective for failing to request further explanation of these principles.  (*People v. Jackson* (1989) 49 Cal.3d 1170, 1188 [counsel was not ineffective when the record illuminates a reasonable explanation for counsel's failure to object].)

V

*The Trial Court Properly Instructed The Jury On Contrived Self-Defense,*
*Mutual Combat, And Imperfect Self-Defense*

Defendant contends the trial court improperly instructed the jury on the principles of mutual combat, contrived self-defense, and unreasonable self-defense.  More specifically, he argues that portions of these instructions were unsupported by the evidence and were vague, ambiguous, and unconstitutionally overbroad.  He asserts that he was not required to object to these improper instructions, but in the event he was, his failure should be excused because his substantial rights were affected by the giving of the instructions.  In the event we conclude defendant has forfeited these claims, he asserts his counsel was ineffective for failing to object to the challenged portions at trial.

We conclude the jury instructions were correct statements of law and responsive to the evidence, thus they did not affect defendant's substantial rights and he forfeited his claims.  Further, because these instructions were correctly given, trial counsel was not ineffective for failing to object to the portions defendant now challenges on appeal.

19

"Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court. [Citations.]  The rule of forfeiture does not apply, however, if the instruction was an incorrect statement of the law [citation], or if the instructional error affected the defendant's substantial rights.  [Citations.]  ' "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim -- at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." ' " (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.)

"We review de novo whether a jury instruction correctly states the law. [Citations.]  Our task is to determine whether the trial court ' "fully and fairly instructed on the applicable law."  [Citation.]' [Citation.]  When instructions are claimed to be conflicting or ambiguous, 'we inquire whether the jury was "reasonably likely" to have construed them in a manner that violates the defendant's rights.'  [Citation.]  We look to the instructions as a whole and the entire record of trial, including the arguments of counsel.  [Citations.]  We assume that the jurors are ' " 'intelligent persons and capable of understanding *and correlating* all jury instructions . . . given.' " ' [Citation.]  If reasonably possible, we will interpret the instructions to support the judgment rather than to defeat it.  [Citation.]  Instructional error affects a defendant's substantial rights if the error was prejudicial under the applicable standard for determining harmless error." (*People v. Franco*, *supra*, 180 Cal.App.4th at p. 720.)

A

*Contrived Self-Defense*

Defendant first argues the instruction on contrived self-defense was improper because it was overbroad, vague, ambiguous, and misleading and was also not supported by the evidence.  We disagree.  The jury was instructed with CALCRIM No. 3472, which states that the "[r]ight to self-defense may not be contrived.  A person does not have the

20

right to self-defense or to imperfect self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." This is a correct statement of the law. "In *People v. Enraca* (2012) 53 Cal.4th 735, 761 . . . (*Enraca*) our Supreme Court explained that the self-defense doctrine 'may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.' In *Enraca,* 'the trial court instructed the jury . . . [with] CALJIC No. 5.55: "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense." ' (*Ibid.*) While *Enraca* involved the CALJIC analog to CALCRIM No. 3472, the language of the two instructions is materially the same. CALCRIM No. 3472 is therefore generally a correct statement of law. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 . . . .)" (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333.)

Defendant argues the instruction was overbroad, vague, ambiguous, and misleading because it essentially told the jury defendant forfeited a claim of imperfect or complete self-defense if he provoked a verbal quarrel to which Hernandez responded with deadly force. This argument was advanced in *People v. Ramirez* (2015) 233 Cal.App.4th 940, 947, and the court found instructional error. In *Ramirez*, evidence showed that the defendant, who was a gang member, assaulted rival gang members and then responded with deadly force when he believed a rival gang member had a weapon. (*Id.* at pp. 944-945.) The court found, "CALCRIM No. 3472 under the facts before the jury did not accurately state governing law. The blanket rule articulated in CALCRIM No. 3472 and reiterated by the prosecutor effectively told the jury, 'A person does not have [*any*] right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use [*any*] force.' In effect, the prosecutor and the trial court advised the jury that one who provokes a fistfight forfeits the right of self-defense if the adversary resorts to deadly force." (*Id.* at p. 947.)

*Ramirez* is readily distinguishable. "CALCRIM No. 3472 is generally a correct statement of law, which might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*People v. Eulian*, *supra*, 247 Cal.App.4th at p. 1334.) Here, there is no evidence defendant provoked a nondeadly confrontation, to which Hernandez responded with deadly force. The testimony of Pena and Garcia showed, at most, the two engaged in a verbal argument and walked towards one another, before defendant shot Hernandez. Defendant's mother's testimony tended to show that defendant did not provoke a fight at all and was the victim of a violent assault, which ended in the death of Hernandez at the hands of a third party. Neither version of events presents the factual circumstances presented in *Ramirez* requiring a modification of the contrived self-defense instruction. Thus, the instruction as given was not overbroad, ambiguous, vague, or misleading under the facts of this case because it did not communicate to the jury that defendant forfeited self-defense because he started a fight involving nondeadly force.

Further, the jury was instructed right before the instruction on contrived self-defense that "if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to stop fighting or communicate the desire to stop to the opponent or to give the opponent a chance to stop fighting." This instruction adequately communicated the principles defendant complains were lacking from the contrived self-defense instruction and placed the contrived self-defense instruction into context. When considering these instructions together, the jury was properly instructed that defendant did not forfeit self-defense through the use of nondeadly force.

Finally, the giving of the contrived self-defense instruction was supported by substantial evidence. The jury could rationally conclude defendant provoked the conflict between Hernandez and himself by running into Hernandez with his scooter, throwing his

22

scooter down, and then approaching Hernandez while making "vulgar comments." Hernandez responded in kind by "exchanging words" with defendant and putting down the box and table he was carrying. Defendant then shot Hernandez, killing him. If the jury determined Hernandez yelled at and approached defendant in response to defendant's initial aggressive conduct, defendant did not have the right to use deadly force to settle the verbal confrontation he arguably created. (See *People v. Eulian*, *supra*, 247 Cal.App.4th at p. 1334.) This conduct provided a factual predicate for instructing the jury on contrived self-defense. Because the instruction was legally correct and responsive to the evidence, defendant was not prejudiced and his substantial rights were not implicated. (*People v. Franco*, *supra*, 180 Cal.App.4th at p. 719.) For these same reasons, his counsel was not ineffective for failing to object to the giving of the contrived self-defense instruction. (See *People v. Price*, *supra*, 1 Cal.4th at pp. 386-387 [defense counsel is not required to make frivolous objections].)

B

*Mutual Combat Or Initial Aggressor*

Defendant's second argument involves the jury instruction on mutual combat or initial aggressor. He does not argue this instruction was a misstatement of the law, only that it was unsupported by the evidence because the evidence did not reflect a mutual agreement to fight, or that defendant was the initial physical aggressor.[1] We disagree.

" '[M]utual combat' consists of fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight. The agreement need not have all the characteristics of a legally binding contract; indeed, it necessarily lacks at least one such characteristic: a lawful object. But there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1046-1047.) Here, Garcia and Pena testified defendant ran into Hernandez with his scooter and then threw the scooter down before approaching Hernandez while cursing at him. Garcia's and Pena's prior statements indicated Hernandez engaged in a verbal altercation with defendant by also cursing at defendant

---

[1]    The jury was instructed per CALCRIM No. 3471 as follows: "A person who engages in mutual combat or who starts a fight has a right to self-defense as defined in instruction 505, or to imperfect self-defense as defined in instruction 571, only if: One, he actually and in good faith tried to stop fighting; two, he indicated by word or by contact to his opponent in a way a reasonable person would have understood that he wanted to stop fighting and that he had stopped fighting; and three, he gave his component [*sic*] a chance to stop fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to stop fighting or communicate the desire to stop to the opponent or to give the opponent a chance to stop fighting. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

24

before putting down the items he was carrying to walk toward defendant. Garcia understood their conduct to be "an initiation of a fight." A jury could reasonably find from this evidence that both Hernandez and defendant intended to engage in a fight by implied agreement before defendant shot Hernandez.

So too did evidence exist for the jury to find defendant was the initial aggressor in the fight. As described, defendant ran into Hernandez with his scooter and then approached him while yelling "vulgar comments." This caused Hernandez to put down the items he was carrying to respond to defendant's conduct. A jury could reasonably conclude defendant intended a physical assault when he approached Hernandez. Indeed, defendant's subsequent actions proved he intended some type of physical assault considering he shot Hernandez seconds after Hernandez put the items he was carrying down to respond to defendant's aggressive conduct.

Because the instruction was responsive to the evidence, defendant's substantial rights were not implicated. (*People v. Franco*, *supra*, 180 Cal.App.4th at p. 719.) For these same reasons, his counsel was not ineffective for failing to object to the giving of the mutual combat or initial aggressor instruction. (See *People v. Price*, *supra*, 1 Cal.4th at pp. 386-387 [failure to raise a meritless objection is not ineffective assistance of counsel].)

## C

### *Imperfect Self-Defense*

Defendant's last argument involves an optional portion of the pattern imperfect self-defense instruction, CALCRIM No. 571, which instructs the jury "[i]mperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force." He argues that this instruction is unconstitutionally vague, overbroad, ambiguous, and misleading because the jury is not told "wrongful conduct" includes "the initiation of a physical assault or the commission of a felony." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Because

25

the jury did not know what "wrongful conduct" meant, he continues, it could use the broad language as an excuse to find defendant could not avail himself of imperfect self-defense simply because he was "spoiling for some kind of argument" that later escalated into a deadly encounter.

The language the court used when instructing the jury restates the language in *In re Christian S.*, *supra*, 7 Cal.4th at page 773, footnote 1, and has been approved in other cases. (See *People v. Seaton* (2001) 26 Cal.4th 598, 664; *People v. Hardin* (2000) 85 Cal.App.4th 625, 630.) Further, it is not reasonably probable the jury would have concluded Hernandez was justified to use force simply because defendant started a verbal argument, contrary to defendant's contentions. This is particularly true considering the jury was instructed that defendant could avail himself of self-defense if, in the course of a nondeadly assault initiated by defendant, Hernandez resorted to deadly force requiring defendant respond in kind.

Accordingly, the portion of the imperfect self-defense instruction defendant challenges was not unconstitutionally vague, overbroad, ambiguous, or misleading. Because the jury would not have interpreted the instruction to foreclose defendant's claim of imperfect self-defense in the event it found defendant started a verbal altercation to which Hernandez responded with force, defendant was not prejudiced and his substantial rights were not implicated. (*People v. Franco*, *supra*, 180 Cal.App.4th at p. 719.) For these same reasons, his counsel was not ineffective for failing to object to the giving of this portion of the imperfect self-defense instruction. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694 [80 L.Ed.2d at p. 698] [counsel is not ineffective when there is no reasonable probability the result of the proceedings would have been different had counsel objected].)

*The Instructions Allowed The Jury To Consider Defendant's*

*Mental Impairment When Determining Whether He Met The*

*Requirements Of Imperfect And Complete Self-Defense*

Defendant contends the trial court erred by failing to instruct the jury it could use evidence of his mental impairment when considering the subjective components of imperfect and complete self-defense and also when determining the applicability of the contrived self-defense and mutual combat instructions. Defendant argues we should consider this argument despite his failure to object on these specific grounds at trial. He claims the resulting error implicates his substantial rights, the court had a sua sponte duty to instruct on these principles, and his related objection to the mental impairment instruction regarding the objective component of self-defense should have been sufficient to "signal[] the issue for the court." He further argues any objection or request for a pinpoint instruction on the grounds he now argues would have been futile given the court's comments. Finally, defendant argues his counsel was ineffective for failing to object to these instructions as given.

We apply the same principles of instructional error analysis as articulated in the previous section, keeping in mind that we necessarily must examine the merits of defendant's claim to determine whether his substantial rights were implicated by the errors he alleges. (*People v. Franco*, *supra*, 180 Cal.App.4th at p. 719.)

We conclude the trial court correctly conveyed to the jury that it could consider defendant's mental impairment when determining whether he acted in imperfect or complete self-defense, including the related principles of mutual combat and contrived self-defense. If trial counsel wanted a clarifying instruction, he was required to object on those specific grounds, and because he did not, the issue of whether a clarifying instruction about mental impairment was required has been forfeited. (*People v. Lang* (1989) 49 Cal.3d 991, 1024.) Because the entirety of the court's instructions adequately

27

informed the jury defendant's mental impairment could be considered when determining imperfect and complete self-defense, defense counsel was not ineffective for failing to object or requesting a pinpoint instruction.

The jury was instructed on mental impairment as follows: "You have heard evidence that the defendant may have suffered from a mental disease, defect, or disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent and mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically: malice aforethought for murder, as defined in instruction 520; and deliberation and premeditation for first degree murder, as defined in instruction 521. If the People have not met this burden, you must find the defendant not guilty of murder."

Imperfect self-defense requires a showing the defendant actually believed he was in imminent danger of suffering great bodily injury or being killed and he actually believed he must immediately use deadly force to defend against the danger, but at least one of these beliefs was unreasonable. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) In addition to conveying this rule, the instruction on imperfect self-defense (CALCRIM No. 571) told the jury "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense." As we have discussed in section IV, this instruction, in essence, told the jury that defendant's acts did not constitute murder if he acted in imperfect self-defense. (See *People v. Genovese*, *supra*, 168 Cal.App.4th at pp. 831-832.) The mental impairment instruction also told the jury defendant's mental impairment could be considered to determine whether he harbored the required intent for the charged crimes, in essence, also informing the jury defendant's mental impairment could reduce murder to manslaughter. Because both imperfect self-defense and mental impairment could be considered by the jury to reduce murder to manslaughter, in other words to eliminate

28

malice, logically it stands to reason that defendant's mental impairment could be used for this same purpose in regard to determining whether defendant harbored the mental state required for imperfect self-defense. In fact, defense counsel argued this exact point to the jury during closing argument. After arguing the prosecution proved defendant committed voluntary manslaughter based on imperfect self-defense and heat of passion, defense counsel argued, "[t]he [c]ourt will instruct you that you're allowed to consider his intellectual disability on these very subjects that I'm talking to you about. Whether he can premeditate and deliberate. How long it takes him. What [a]ffect his intellectual disability would have on the ability to reflect, to see a problem, to formulate a response and implement that response. And, again, the government has to disprove imperfect self-defense. Disprove heat of passion. But what they've done with their own witnesses is the opposite."

When taken together, the mental impairment, imperfect self-defense, and murder instructions adequately informed the jury it could consider defendant's mental disability when determining whether he actually believed in the need for self-defense. Accordingly, the trial court properly instructed the jury regarding imperfect self-defense and mental impairment.

Similar reasoning applies to the complete self-defense instruction. Complete self-defense requires both actual subjective belief and objective reasonableness. (*People v. Humphrey*, *supra*, 13 Cal.4th at pp. 1093-1095.) A defendant acts in self-defense when his or her " 'acts causing the victim's death were motivated by an actual (also referred to as "genuine" or "honest") belief or perception that (a) the defendant was in imminent danger of death or great bodily injury from an unlawful attack or threat by the victim and (b) the defendant's acts were necessary to prevent the injury; and . . . a reasonable person in the same circumstances would have had the same perception and done the same acts.' " (*Id*. at p. 1093.) The jury was instructed as part of the imperfect self-defense instruction that "[t]he difference between complete self-defense and imperfect self-

29

defense depends on whether the defendant's belief in the need to use deadly force was reasonable." The complete self-defense instruction (CALCRIM No. 505) told the jury "defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense." Taken together, these instructions informed the jury that, for the purpose of complete self-defense, it could properly consider defendant's mental impairment when determining his subjective belief in the need for self-defense -- just like it could when determining whether defendant acted in imperfect self-defense. Then, the jury could in turn, justify (and thereby excuse) the murder entirely by determining defendant's belief in the need for self-defense was reasonable. Thus, while the jury was not instructed explicitly that it could consider defendant's mental disability when considering his claim of complete self-defense, the instructions allowed the jury to do so and in turn to use its finding to legally justify the killing. Accordingly, the trial court properly instructed the jury on complete self-defense and mental impairment.

Defendant also argues the instructions did not properly convey to the jury it could consider his mental impairment to determine whether he had the mental state required for mutual combat or contrived self-defense. Mutual combat requires an agreement to enter into combat, while contrived self-defense requires an intent to create an excuse to use force. Defendant argues the jury did not know it could consider his mental impairment when determining these intent elements. The mutual combat and contrived self-defense instructions, however, expressly related to imperfect self-defense and complete self-defense and were delivered as part of the complete self-defense instruction. As described, the imperfect self-defense instruction adequately informed the jury of the requirements for reduction of murder to voluntary manslaughter, and that it could use defendant's mental impairment when making that determination. Thus, reading these instructions together, the jury was allowed to consider defendant's mental impairment when determining his intent relating to all subjective components of complete and imperfect self-defense, including mutual combat and contrived self-defense.

30

To the extent defendant argues the jury should have been told a finding of complete self-defense and imperfect self-defense mitigate or justify malice, that claim is similarly unavailing. In *Genovese*, *supra*, 168 Cal.App.4th at pp. 830-831, we said that "it does not matter that the CALCRIM instructions failed to inform the jury that imperfect defense of another would eliminate malice. As we have set forth above, the jury was told, in a series of instructions, what different kinds of acts and situations would reduce the crime from murder to voluntary manslaughter. It is immaterial that the jury was not informed that, in fact, what was going on was that the jury was finding an 'absence of malice.' As Justice Corrigan has explained in her Preface to the CALCRIM jury instructions, 'our work reflects a belief that sound communication takes into account the audience to which it is addressed.' (Judicial Council of Cal., Crim. Jury Instns. (2008) Preface, p. xi.) 'Malice is another word of multiple meanings in criminal law. . . .' (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 11, p. 213.) The definition of malice may be interesting to lawyers and judges and law professors, but it does not aid the task of lay jurors to inform them that, when the defendant acts in an honest but unreasonable belief in the need to defend another, he is acting without malice. Consequently, the CALCRIM instructions are not erroneous in their failure to tell the jury the role that malice (or lack of malice) plays in reducing murder to voluntary manslaughter."

Because we have concluded the instructions allowed the jury to consider defendant's mental impairment when determining whether he met the requirements of imperfect or complete self-defense, the court fulfilled its sua sponte duty to instruct the jury on the law and defendant's substantial rights were not affected.

Further, defense counsel did not request a modification of the mental impairment instruction, so that the jury would be explicitly told it could use defendant's mental impairment when determining imperfect and complete self-defense. Defendant's proposed modification to the mental impairment instruction sought to tell the jury it could

31

take mental impairment into consideration when applying the *objective* component of complete self-defense and the related principles of mutual combat and contrived self-defense. The court addressed defendant's objection concerning the reasonable person component of the instructions. Neither the court nor defense counsel ever addressed the subjective components of these same instructions. Instead, it appears the court and parties understood the interplay of the mental impairment instruction with self-defense and imperfect self-defense, and how these concepts serve to negate the malice element of murder. Thus, defendant's objection was not sufficient to "signal[] the issue for the court" that he wished to have a pinpoint instruction regarding his mental impairment and its effect on imperfect and complete self-defense.

Neither would have an objection or a request for a pinpoint instruction on the relationship between defendant's mental impairment and the subjective components of imperfect and complete self-defense been futile, as defendant claims. Defendant claims the court's statement that it was "going to stick with the standard instruction and current case law" foreclosed any further objection on the issue. We disagree. The court went on to say in the next breath, "[a]nd if the reasonable person standard is to be changed, it will be at a higher level than this trial court." From these comments, it is clear the trial court's decision applied only to the reasonable person modification defendant requested and did not apply to any other aspect of the mental impairment standard. There is nothing in the court's comments that indicate it would not have entertained an objection or a request for a pinpoint instruction regarding the defendant's mental impairment and the subjective components of imperfect and complete self-defense.

Finally, defense counsel was not ineffective for failing to object or request a pinpoint instruction. As described, the instructions allowed the jury to consider defendant's mental impairment when determining whether he could avail himself of imperfect or complete self-defense. Further, defense counsel talked extensively about the details of defendant's mental impairment and the expert's testimony on the issue during

32

closing argument. He then argued, in regard to imperfect and complete self-defense, that the jury could consider defendant's intellectual disability when determining whether he acted with the required mental states for those offenses. From this argument, it is clear defense counsel thought the instructions were complete and understandably communicated to the jury it could consider defendant's mental impairment when determining the subjective components of imperfect and complete self-defense. Because the record illuminates a reasonable explanation for counsel's failure to object, defense counsel was not ineffective for failing to object or request a pinpoint instruction regarding the relationship between mental impairment and imperfect or complete self-defense. (*People v. Jackson*, *supra*, 49 Cal.3d at p. 1188.)

VII

*Defendant Was Not Prejudiced By The Trial Court's Failure*

*To Instruct On Involuntary Manslaughter*

Defendant contends the trial court had a sua sponte duty to instruct the jury on involuntary manslaughter as a lesser included offense to murder because the evidence showed he harbored a mental state short of wanton or conscious disregard for life. Because defendant's mental state was not one of malice, he argues, the court was required to instruct the jury on an unlawful killing during the course of a variety of misdemeanors, such as assault, battery, or brandishing a firearm, or on the use of excessive force during the course of self-defense. We conclude it is not reasonably probable a jury would have convicted defendant of involuntary manslaughter had it been instructed on the theories defendant advances.

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense." (*People v. Shockley* (2013) 58 Cal.4th 400, 403.) Issues

33

concerning the failure to instruct on a lesser included offense are reviewed de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

Manslaughter is the unlawful killing of a human being without malice. Penal Code section 192 defines involuntary manslaughter as a killing occurring during the commission of "an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, [accomplished] in an unlawful manner, or without due caution and circumspection." (Pen. Code, § 192, subd. (b).) Penal Code section 192 has been interpreted to encompass an unintentional killing in the course of a noninherently dangerous felony committed without due caution or circumspection. (*People v. Burroughs* (1984) 35 Cal.3d 824, 835, overruled on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 88-91; see *People v. Bryant* (2013) 56 Cal.4th 959, 970; *People v. Brothers* (2015) 236 Cal.App.4th 24, 33-35 ["when the evidence presents a material issue as to whether a killing was committed with malice, the court has a sua sponte duty to instruct on involuntary manslaughter as a lesser included offense"].)

Defendant argues his mental impairment and the fact that he shot Hernandez once during an argument that lasted a matter of seconds supported a finding that he did not appreciate the risk to life he posed with his actions, thereby requiring an instruction on involuntary manslaughter. We need not determine whether the trial court had a duty to instruct the jury on involuntary manslaughter because, even had the court done so, it is not reasonably probable the result of defendant's case would have been different.

"The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.' [Citation.] 'Such posttrial review focuses not on what a reasonable jury *could do*, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome

34

is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Thomas* (2012) 53 Cal.4th 771, 814, fn. omitted.)

Defendant first argues it is reasonably probable the jury would have found him guilty of involuntary manslaughter, had it been instructed on that offense, based on his conduct of committing the misdemeanor acts of brandishing a firearm, assault, or battery. We are not persuaded. As our high court has observed, in the context of brandishing a firearm, "[a]n unintentional shooting . . . can be murder if the jury concludes that the act was dangerous to human life and the defendant acted in conscious disregard of life." (*People v. Thomas*, *supra*, 53 Cal.4th at pp. 814-815.) Thus, in such a scenario, "[i]n order to find defendant guilty of only involuntary manslaughter, the jury would have had to conclude *both* that the shooting was accidental and that defendant had acted without malice." (*Id*. at p. 815.) Here, the jury found defendant intentionally, not accidently, discharged a firearm causing death during the commission of the murder by finding the firearm enhancement allegation pursuant to Penal Code section 12022.53, subdivision (d) true. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085-1086.) Based on this finding, the jury clearly rejected the notion that defendant discharged the gun unintentionally.

Defendant attempts to avoid this conclusion by suggesting his intent regarding the discharge of the firearm does not necessarily inform us how the killing occurred or defendant's intent regarding the risk of life he posed to his victim. This argument gets defendant nowhere. At a minimum, the jury found defendant personally and intentionally discharged his firearm, proximately causing the victim's death. In the face of the jury's finding, an involuntary manslaughter theory premised on the notion that defendant did not fire his firearm at the victim would only be viable if there was evidence that,

35

notwithstanding defendant's personal and intentional discharge of his firearm, it was defendant's criminal negligence that caused the victim's death. For example, if defendant personally and intentionally fired warning shots in the air to quell further escalation but, through criminal negligence, ended up hitting the victim instead, an involuntary manslaughter theory might make sense. Here, however, there was no evidence from which the jury could find that although defendant personally and intentionally discharged his firearm, he negligently did so for some purpose other than shooting the victim. Further, the intentional discharge of a firearm in a criminally negligent manner has been regarded as an inherently dangerous felony that would support a verdict of second degree felony murder. (*People v. Howard* (2005) 34 Cal.4th 1129, 1136; *People v. Clem* (2000) 78 Cal.App.4th 346, 348, 350-351 [concluding that the intentional discharge of a firearm in a grossly negligent manner is an inherently dangerous felony for purposes of the felony-murder rule].) Thus, the argument that the jury would have likely found him guilty of involuntary manslaughter based on his conduct of brandishing a firearm is without merit.

Defendant's argument the murder occurred during the commission of a misdemeanor assault or battery is similarly unavailing. Defendant did not commit a misdemeanor assault when he shot defendant with a gun, he committed assault with a deadly weapon (Pen. Code, § 245) and personally and intentionally used a firearm during the commission of that offense. This is a serious felony within the meaning of Penal Code section 1192.7, subdivision (c)(8). Further, a battery that results in serious bodily injury is a felony, not a misdemeanor. (Pen. Code, § 243, subd. (d); *People v. Wade* (2012) 204 Cal.App.4th 1142, 1147-1148.) The nature and extent of the injury actually suffered by a victim determines whether the force used was felonious in nature. (*People v. Covino* (1980) 100 Cal.App.3d 660, 667, citing *People v. Wells* (1971) 14 Cal.App.3d 348, 358.) A battery causing serious bodily injury is also a serious felony within the meaning of Penal Code section 1192.7, subdivision (c)(8). (*People v. Moore* (1992) 10

36

Cal.App.4th 1868, 1871; see also *People v. Arnett* (2006) 139 Cal.App.4th 1609, 1613-1614.)

Second, defendant argues it is reasonably probable the jury, had it been instructed on the lesser offense, would have found him guilty of involuntary manslaughter based on his lawful conduct of self-defense, which was carried out in an unlawful manner by the use of excessive force. Again, we are not persuaded. Defendant cites no authority for this proposition besides the statute and jury instruction for involuntary manslaughter, nor does he argue how the jury could have found him guilty of involuntary manslaughter based on this theory. Moreover, cursory research reveals that there is no current legal theory warranting an instruction on principles of involuntary manslaughter based on a killing committed in the course of imperfect self-defense. (See *People v. Blakeley*, *supra*, 23 Cal.4th at p. 91 ["[W]e conclude that when a defendant, acting with a conscious disregard for life, unintentionally kills in unreasonable self-defense, the killing is voluntary rather than involuntary manslaughter"].)

For the foregoing reasons, we conclude there is no reasonable probability that instructions on involuntary manslaughter under any theory advanced by defendant would have changed the result. (*People v. Thomas*, *supra*, 53 Cal.4th at p. 814.)

VIII

*There Was No Cumulative Error*

Defendant seeks reversal based on cumulative error. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Here, we have found defendant was not harmed by the trial court's failure to instruct on involuntary manslaughter (assuming without deciding that failure to instruct was error) and that no other error occurred. Accordingly, there was no cumulative error here.

*Defendant Is Not Entitled To A Franklin Remand But Is Entitled To Remand For*

*The Trial Court To Consider Striking The Firearm Enhancement*

Defendant contends he is entitled to remand to the trial court because the record is not clear that he was afforded a sufficient opportunity to place evidence on the record necessary for his eventual youth offender parole hearing under Penal Code section 3051. The People respond that defendant was already afforded this opportunity and failed to take advantage of it.  We agree with the People.

In *Franklin*, the California Supreme Court noted that the Eighth Amendment of the United States Constitution prohibition against cruel and unusual punishment prohibits a criminal court from sentencing a minor "to the functional equivalent of [life without parole] for a homicide offense" without taking into account " 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison' "  (*People v. Franklin* (2016) 63 Cal.4th 261, 275, 276, quoting *Miller v. Alabama* (2012) 567 U.S 460 [183 L.Ed.2d 407].)  The court concluded, however, that a juvenile's claim that his sentence of 50 years to life was the functional equivalent of life without parole and thus unconstitutional was moot in light of recent statutory amendments that provided for parole hearings for youthful offenders.  (*Franklin*, at p. 268; see Pen. Code, § 3051, subd. (a)(1) [A "youth offender parole hearing" is held "for the purpose of reviewing the parole suitability of any prisoner who was 25 years of age or younger, or was under 18 years of age as specified in paragraph (4) of subdivision (b) at the time of his or her controlling offense"] and § 4801, subd. (c) [at a youth offender parole hearing, the Board of Parole Hearings "shall give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law"].)  The court explained, "Consistent with constitutional dictates, those statutes provide [the juvenile] with the possibility of release after 25 years of imprisonment

[citation] and require the [parole board] to 'give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity.' " (*Franklin*, at p. 268.)

Because the enactment of the statutes meant that the juvenile was "now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration," his sentence was "neither [life without parole] nor its functional equivalent" and "no *Miller* claim arises." (*People v. Franklin*, *supra*, 63 Cal.4th at pp. 279-280.) Although the court in *Franklin* held that the juvenile offender "need not be resentenced," the court remanded "the matter to the trial court for a determination of whether [the juvenile] was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing" because it was "not clear" whether the juvenile had been afforded such an opportunity previously. (*Id*. at p. 284.)

The court advised, "If the trial court determines that [the juvenile] did not have sufficient opportunity, then the court may receive submissions and, if appropriate, testimony pursuant to procedures set forth in section 1204 [of the Penal Code] and rule 4.437 of the California Rules of Court, and subject to the rules of evidence. [The juvenile] may place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors. The goal of any such proceeding is to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors [citation] in determining whether the offender is 'fit to rejoin society' despite having committed a

serious crime 'while he was a child in the eyes of the law.' " (*People v. Franklin*, *supra*, 63 Cal.4th at p. 284.)

Here, defendant points out that "[n]o mention of youth-related factors or indeed any significant arguments on mitigating factors was made on the record at sentencing," "[t]he probation report contains no statements or letters from [defendant] or his family," and "as to mitigating factors the report states 'none' except youthful age (then 21)." From this, defendant concludes that " 'the probation report and sentencing transcript, together, do not remotely address all five . . . youth sentencing factors that the parole authority must give weight to in assessing whether to release [defendant] on parole,' " and therefore " ' "it is not clear whether [the defendant] had sufficient opportunity to put on the record the kinds of information that [Penal Code] section[s] 3051 and 4801 deem relevant at a youth offender parole hearing." ' " For that reason, he requests " 'a modest limited remand' " " 'to afford [him] such an opportunity if the court finds he was not afforded one at the original sentencing.' "

We are not persuaded that defendant is entitled to a remand under *Franklin*.[2] Unlike the defendant in *Franklin*, defendant was 19 years old at the time of his offense and thus he was not subjected to a sentence that violated constitutional principles prohibiting a minor from being sentenced to the functional equivalent of life without parole without considering how minors are different from adults and how those differences counsel against irrevocably sentencing a minor to a lifetime in prison. Moreover, unlike the defendant in *Franklin*, defendant was not sentenced at a time when

---

[2]     We previously issued an opinion in this case reaching the same conclusion, but the Supreme Court granted defendant's petition for review and transferred the case back to us "with directions to vacate [our] decision and reconsider whether defendant is entitled to make a record before the superior court of 'mitigating evidence tied to his youth' in light of" *Franklin* and Penal Code sections 3051 and 4801, subdivision (c).  Having reconsidered the issue, we reach the same conclusion we reached before.

youth offender parole hearings were not yet part of California law.  Defendant *is* entitled to a youth offender parole hearing under Penal Code section 3051, but *not* because he was sentenced to the functional equivalent of life without parole for a crime committed when he was a minor.  Rather, he is entitled to a youth offender parole hearing only because the California Legislature decided, effective beginning in January 1, 2016, that youth offender parole hearings should be afforded to "any prisoner who was under 25 years of age or younger or was under 18 years of age as specified in paragraph (4) of subdivision (b) at the time of his or her controlling offense."  (Pen. Code, § 3051, subd. (a)(1), as amended by Stats. 2017, ch. 675, § 1.)  Thus, unlike the situation in *Franklin*, when defendant was sentenced in this case on April 8, 2016, Penal Code section 3051 was already in place and had already been amended to encompass offenders like him under 25 years of age or younger, and subdivision (c) of Penal Code section 4801 already identified the various factors to be considered at a youth offender parole hearing.  Thus unlike the defendant in Franklin, defendant had both the opportunity and incentive to put information on the record related to a future youth offender parole hearing.

Under these circumstances, there is no reasonable basis for concluding, as defendant argues, that defendant was denied a sufficient opportunity to put on the record the kinds of information that Penal Code sections 3051 and 4801, subdivision (c) deem relevant at a youth offender parole hearing.  It is true, as defendant notes, that defendant's sentencing hearing occurred before our Supreme Court decided *Franklin*, but that makes no difference given that it was not the decision in *Franklin* that gave rise to defendant's right to a youth offender parole hearing.  Instead, as we have explained, it was the amendment to Penal Code section 3051 that took effect months before defendant's sentencing hearing that gave rise to that right, and on the record here there is no reason to believe that defense counsel did not have every reasonable opportunity and incentive to make an adequate record for defendant's eventual youth offender parole hearing.  (See *People v. Cornejo* (2016) 3 Cal.App.5th 36, 68-70 [remand not necessary when the

41

defendants were given an opportunity to make a record and provided relevant information for an eventual youth offender parole hearing].)

During defendant's sentencing hearing, the court asked defense counsel multiple times whether he wanted to add anything to what was contained in the 11-page probation report. Defense counsel said that he had nothing to add to the probation report, including documents, and the probation report contained no errors or omissions. Further, defense counsel stated that the "probation report notated the mitigating factors that [he] would bring up." The probation report included information regarding defendant's psychological and medical problems, along with a summary of Dr. Miller's report. This summary included details of defendant's home life, education, psychiatric treatment, criminal history, and IQ test.

Given the trial court's numerous invitations to defense counsel to add information to the record and defense counsel's statements that the probation report was sufficient, we conclude defendant "was afforded sufficient opportunity to make a record of information relevant to [defendant's] eventual youth offender parole hearing." (See *People v. Franklin*, *supra*, 63 Cal.4th at p. 284.) Thus, there is no basis for a *Franklin* remand here.

Defendant further argues, however, that under a recent change to Penal Code section 12022.53, his case must be remanded so that the trial court can exercise its newly-granted discretion to decide whether to strike the firearm enhancement imposed here. The People concede that such a remand is required, and we agree.

As we have noted, defendant's sentence in this case includes a sentence enhancement of 25 years to life under subdivision (d) of Penal Code section 12022.53 for personally and intentionally discharging a firearm and proximately causing death to a person other than an accomplice. At the time of his sentencing, the trial court had no power to strike the firearm enhancement or impose a sentence other than 25 years to life. Under a recent amendment to Penal Code section 12022.53, however, which is effective January 1, 2018, trial courts will have the power under subdivision (h) of the statute, "in

42

the interest of justice pursuant to Section 1385 and at the time of sentencing, [to] strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."

Defendant contends this amendment applies to his case because the Legislature expressly provided for the retroactive application of the amendment "by specifying the new rule applies to '*any resentencing* that may occur.' "  He further contends, based on *In re Estrada* (1965) 63 Cal.2d 740, and related cases, that the amendment applies to him because "regardless of statutory intent, settled case law affords defendants in non-final cases the retroactive benefit of subsequent legislative ameliorations in punishment."

The People agree that because the amendment provides discretion to impose a lesser sentence, and because there is nothing in the amendment to suggest the Legislature intended it to apply prospectively only, the presumption that the amendment applies retroactively prevails.  The People do not argue that remand in this instance would be futile (see *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896), but instead agree that here the case must be remanded to allow the trial court to exercise its newly-granted discretion to decide whether to strike the firearm enhancement.

We agree with defendant and the People that remand is appropriate here.  Under *Estrada*, "when a statute mitigating punishment becomes effective after the commission of the prohibited act but before final judgment the lesser punishment provided by the new law should be imposed in the absence of an express statement to the contrary by the Legislature."  (*People v. Francis* (1969) 71 Cal.2d 66, 75-76.)  As the Supreme Court stated in *Estrada*, "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act.  It is an inevitable inference that the Legislature must have intended that the new statute

43

imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*In re Estrada*, *supra*, 63 Cal.2d at p. 745.)

Here, the amendment to subdivision (h) of Penal Code section 12022.53, which will take effect before the judgment in this case is final, necessarily reflects a legislative determination that the previous bar on striking firearm enhancements was too severe, and that trial courts should instead have the power to strike those enhancements in the interest of justice. Moreover, because there is nothing in the amendment to suggest any legislative intent that the amendment would apply prospectively only, we must presume that the Legislature intended the amendment to apply to every case to which it constitutionally could apply, which includes this case. Accordingly, remand is appropriate in this case to allow the trial court to exercise its discretion as to whether to strike the firearm enhancement.[3]

---

[3] Although we are remanding the case specifically to allow the trial court to exercise its discretion under the recent amendment to subdivision (h) of Penal Code section 12022.53, our determination that defendant is not entitled to remand under *Franklin* does not necessarily preclude the trial court from supplementing the record for purposes of defendant's eventual youth offender parole hearing, should defendant ask to do so and should the trial court determine that such supplementation would be appropriate. Indeed, it may well be that information offered to the trial court to assist in its determination of whether to exercise its discretion to strike the firearm enhancement will be the same sort of information that would be offered under a *Franklin* remand in any event. Accordingly, we leave it to the trial court in the first instance to decide what additional information may be entered into the record on remand.

44

DISPOSITION

Defendant's conviction is affirmed, but the case is remanded to the trial court for further proceedings consistent with this opinion.

/s/
Robie, Acting P. J.

We concur:

/s/
Butz. J.

/s/
Duarte, J.