[No. C055486. Third Dist. Nov. 24, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ROBERT GENOVESE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part II. of the Discussion.

818

COUNSEL

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Michael P. Farrell, Assistant Attorneys General, Carlos A. Martinez and Wanda Hill Rouzan, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SIMS, Acting P. J.**—A jury convicted defendant Michael Robert Genovese of second degree murder in the killing of Douglas Sanford (Pen. Code, § 187; undesignated statutory references are to the Penal Code), rejecting the prosecution's theory of first degree murder and the defense theory of manslaughter based on imperfect defense of another. The jury also found that defendant personally used a deadly weapon, a knife. (§ 12022, subd. (b)(1).) Sentenced to a prison term of 15 years to life, plus one year for weapon use, defendant claims prejudicial instructional error.

In the published portion of the opinion, we shall review the standard series of CALCRIM homicide instructions given the jury. We shall conclude there was no instructional error.

In the unpublished portion of the opinion, we conclude the trial court did not commit prejudicial error by giving the jury modified versions of CALCRIM Nos. 3471 and 3472.

We shall therefore affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant intervened fatally in a fistfight between the victim and defendant's stepuncle, Bob Fitch, on January 14, 2006. The People argued defendant planned to kill the victim; defendant testified he was trying to stop the victim from beating Bob Fitch to death. However, defendant originally admitted to police that the use of deadly force was unnecessary.

In August 2006, defendant was charged with murder, with personal use of a knife.

At trial, Bob Fitch did not testify, other than to answer questions about his height and weight when called as a defense witness. He said his height was five feet 10 inches, and his weight at the time of the killing was 225 or 230 pounds, which he then revised (after a sidebar) to say he had lost weight and was as low as 198 at the time in question.

At the time of death, the victim was 5 feet 11 inches tall, and weighed 207. Defendant stands five feet eight or nine inches tall, and weighed about 130 pounds at the time of the killing (though he weighed 170 at the time of trial).

Other trial evidence included the following:

The victim was engaged to marry Bob Fitch's ex-girlfriend, Toni Roberts. Roberts testified she dated Bob Fitch for about three years and was employed by the trucking business owned by Bob Fitch and his brother Jim Fitch.[1] Roberts broke up with Bob Fitch before Memorial Day 2005. She initially tried to remain friends because he said he had cancer. However, Bob Fitch found it difficult to let go of the failed relationship and harassed Roberts with phone calls, late night visits, and threats. She described him as an aggressive and angry person, more so when he drank alcohol. The harassment drove Roberts to leave her job in October 2005, but Bob Fitch continued to harass her.

Meanwhile, Roberts met the victim on June 12, 2005, and eventually agreed to marry him. At the time of the killing, they were living on his boat at the Oxbow Marina.

In the evening of January 13, 2006, Bob Fitch went to the Elk Grove Brewery with his teenage daughter Megan and her then boyfriend Ricky Vallenza. Vallenza drove Bob's vehicle because Bob had already been drinking alcohol and continued to drink in the car and at the restaurant. Bob Fitch hoped Roberts would be there, but she was not. Around 9:30 p.m., the Fitch party drove to a convenience store, where Bob bought a knife, and then went to the Oxbow Marina, where he slashed the tires on Roberts's and the victim's vehicles, cutting his own hand in the process. Vallenza and Megan took the knife away from him.

The Fitch party parked nearby, with Bob Fitch yelling Roberts's name and leaving cell phone messages for her. Around 11:00 p.m., Roberts and the victim came up from the dock. Bob Fitch emotionally accosted Roberts.

---

[1] Our references to Jim Fitch are to Bob's brother, not Jim Fitch's son, James.

Everyone told Bob Fitch he was drunk and needed to go home. The victim called 911. The Fitch party drove away.

A deputy sheriff arrived at 11:37 p.m. and observed the slashed tires and blood.

The victim and Roberts fixed the flat tires and moved the victim's truck to a different area. They returned to the boat and discovered Bob Fitch had left a phone message saying he was taking the kids home and would be back in 45 minutes. The victim left the boat, stating he was going to retrieve his jacket from his truck.

Meanwhile, the Fitch party went to the home of Julie Fitch (ex-wife of Bob Fitch's brother and "stepmom" to defendant). Defendant and several other persons were present. Vallenza told them what happened. Defendant asked to see the knife and then put it in his own pocket.

Bob Fitch's brother, Jim Fitch (with whom defendant was living at the time), arrived a half-hour later and found Bob Fitch sitting in the car, "drunk off his ass," with beer cans in the car. Bob Fitch said he wanted to go back to the marina and "kick this guy's ass." Bob Fitch stated about six times that he wanted to kill the victim, and he wanted to see the victim dead and uninvolved with Roberts. Bob Fitch kept asking for his car keys, though he was "falling-down drunk" and had an injured hand. The family brought Bob Fitch into the house and tried to stop his bleeding. Jim called 911 because he did not want to fight with Bob and felt it best to have police intervention. The police did not come right away.

Defendant and others decided to tell Bob Fitch they would take him to the marina, but to take him to the hospital instead. Defendant volunteered to drive. Megan, who was concerned about her father and heard defendant say, "[C]ome on, let's go beat someone up," told her boyfriend (Vallenza) to go with them.

Defendant drove his own car, with Bob Fitch in the passenger seat, and Vallenza in the backseat. Within a half-hour, they returned to retrieve gas money. Vallenza decided to stay at Julie's home.

Jim Fitch testified the plan changed at that point. Defendant planned to drive Bob Fitch around to cool him off and then take him home. Bob Fitch was still talking about going back to the marina. Jim Fitch told defendant not to go near Highway 12, because it led to the marina.

Defendant nevertheless followed Bob Fitch's directions and drove Bob Fitch to the marina, where they encountered the victim.

Defendant's version of events, as related in a videotaped police interview played for the jury, evolved during the interview. He said Bob Fitch, while at Julie Fitch's home, said he "want[ed] him [the victim] dead." Defendant drove Bob around to sober him up. Defendant first said he followed Bob Fitch's directions because defendant was unfamiliar with the area and did not know where they were going. Defendant then said he "[k]ind of" knew they were seeking the victim, but defendant planned simply to drive by the marina "so [Bob Fitch] can stop tripping about it . . . ."

Defendant said they arrived at the marina and saw Roberts's vehicle, driven by the victim, who pulled up and asked if Bob Fitch was in the car.[2] Bob said, "I'm right here." The victim pulled up and blocked defendant's car. The victim and Bob Fitch hopped out of the vehicles. Defendant thought he saw something small in the victim's hand—not a gun, but an object that the victim held as if to swing it.[3] The victim and Bob Fitch tackled each other and rolled around on the ground, hitting each other.

Defendant first said he yelled at Bob Fitch to stop and tried to pull him off the victim. Defendant said he may have kicked the victim, but not intentionally. Defendant finally succeeded in pulling Bob Fitch away as the victim screamed, "I'm dying, Bob. I'm dying. Stop. Stop." Defendant said he did not see anyone get stabbed. Defendant said he saw the knife in Bob's hand as they drove away, and defendant took the knife and threw it out the car window. Defendant's car got stuck, so he called Julie Fitch's home, and she came to pick them up.

The detective left the room, and defendant telephoned Julie and said he was going to tell the police the truth.

The detective returned, said he talked to Bob Fitch and had a clearer idea of what had happened. The detective read defendant his *Miranda* rights.

Defendant admitted he stabbed the victim in the back but said he did it because he was "scared for Bob." Defendant thought it was only once or

---

[2] In contrast, the jury heard an audiotape of 911 calls made by the victim around 2:00 a.m., stating he was in his vehicle in the parking lot and was afraid because the person who had slashed his tires and threatened him was in a vehicle right behind him.

[3] No such object was found on the ground. A .25-caliber gun and a cell phone were found in the victim's pockets.

twice (though the victim had eight stab wounds). Bob Fitch and the victim rolled over, with Bob Fitch now on top, holding the victim down while the victim continued to hit Bob Fitch. Defendant kicked the victim in the head on purpose, because the victim was hurting Bob Fitch. The victim said, "Bob, I'm dying." Defendant saw a car coming and told Bob they had to leave. Defendant ran to his car, and Bob followed.[4]

Defendant stated in the police interview that he did not mean to kill the victim but stabbed him, "because I was scared. I . . . thought he was going to kill Bob. . . . He was beating the crap out of Bob. I thought he was going to kill Bob."

Upon further questioning, defendant said he knew Bob's life was not in danger, he knew stabbing could be fatal, and it was not necessary to kill the victim. Defendant said he did it because he "[j]ust wasn't thinking. It just happened so fast." The detective asked, "why would you take deadly force action in that situation? It wasn't necessary. Was it necessary?" Defendant responded, "No Sir."

When asked why he drove Bob Fitch to the marina when Bob was threatening to kill the victim, defendant gave several answers, i.e., he did not know; he thought Bob wanted only to beat up the victim rather than kill him; and he thought Bob wanted only to finish slashing the tires.

The detective then brought in Bob Fitch, who kept repeating he did not stab anyone. Defendant explained he was the one who stabbed the victim. Bob claimed he did not plan to kill the victim but planned only to tell the victim that he (Bob) had had sex with Roberts a few days earlier.

Defendant showed the police the location where he threw the knife, but it was not found.

The jury heard evidence that Bob Fitch was combative when taken into police custody near dawn, and he tried to kick out the window of the patrol car. A deputy testified Bob Fitch had dried blood all over his face and clothing and some blood on his hand. He also had abrasions, a swollen cheek, and an inch-long cut on his forehead, which could be consistent with getting hit by

---

[4] The motorist testified he saw a male kick something and saw one person (larger than defendant) running away. The motorist stopped and found the victim, who said, "help me" in a shallow breath. The jury was told the parties stipulated the motorist in his 911 call said he saw "two guys" running away.

someone wearing a ring. The police took him to the hospital, where the dried blood was scrubbed off and he received three stitches to the forehead and a tetanus shot. The jury saw a police photograph of Bob Fitch.[5] By the time Bob Fitch's blood was tested at 3:45 p.m., no alcohol was present, but the jury heard evidence concerning the burn-off rate of alcohol. No alcohol was detected in the blood of defendant or the victim.

The victim died of multiple stab wounds. He sustained stab wounds on the back, lower left side of the chest, right side, upper back (four wounds), and right upper arm near the shoulder. The victim also sustained contusions, abrasions and small lacerations on the face and scalp.

At trial, defendant testified in his own defense. He was 20 years old at the time of the killing. He took the knife at Julie's home, thinking it would be harder for Bob to get it from defendant than from Bob's daughter, Megan. (Defendant thought he took the knife from Megan, though other evidence indicated he took it from her boyfriend.) Defendant testified the victim struck the first blow. Defendant said he stabbed the victim in the back once or twice. The victim kept beating Bob. Bob kept taking the hits. Defendant turned to look at an approaching car. When defendant turned back, Bob was on top of the victim, but the victim was still hitting Bob. Defendant kicked the victim once. Defendant tried to push Bob off of the victim but could not, so defendant went back to his car. Bob followed. Bob appeared to be injured.

Defendant said he did not intend to, nor did he want to, kill the victim. Defendant intervened out of concern for the welfare of Bob, who was like family to defendant. Bob gave him a job when he needed one, and the Fitch family took defendant in. Defendant had heard that Bob had throat cancer and therefore assumed Bob was weak. "And the way [the victim] was beating him, I didn't—I—I felt that I had to come in and help him, to save him, because if Doug—if Doug would have kept beating him like he was, there's no telling, he could have killed Bob." Defendant explained his conflicting statement to the police (that he did not think Bob's life was in danger) by saying, "I was scared to say that I stabbed [the victim]." Defendant admitted he realized before the interview that he had stabbed the victim. Bob's brother Jim told defendant before the interview "to choose your words wisely. My brother's life is at stake."

On cross-examination, defendant admitted he now knew what the law of self-defense was but did not know at the time of his police interview. Defendant admitted he was sober at the time of the killing; he knew Bob was

---

[5] Defendant says no police photos were taken of Bob Fitch. However, the cited page of the transcript shows only that a deputy sheriff testified it was not he who took photos.

drunk and very angry, and defendant heard Bob talking at Julie's house about wanting to kill the victim. When confronted with inconsistencies between his trial testimony and his police interview (e.g., his denial that he knew they were going to the marina conflicts with his prior statement that he knew they were going to the marina but thought Bob just wanted to slash more tires), defendant said he was scared and tired at the police interview and gave some answers he thought the detective wanted to hear, just so defendant could go home. Defendant denied the statement attributed to him by Vallenza, i.e., that defendant wanted to go back and finish what Bob could not.

Julie Fitch testified that, when she picked up defendant and Bob Fitch at the marina area, defendant said he stabbed the victim to save Bob's life. Bob Fitch was saturated in blood from head to toe. On cross-examination, she admitted she loves defendant like a son. She took away Bob Fitch's car keys before the incident because she believed him when he said he wanted to kill the victim and did not care if he (Bob) landed in prison because he had no reason to live. On the drive home, Bob Fitch was happy and thrilled and said, "we really got that guy good."

The jury found defendant guilty of second degree murder and found true the knife allegation.

The trial court sentenced defendant to a prison term of 15 years to life for murder, plus one year for the enhancement.

## DISCUSSION

### I. *Instruction Regarding Voluntary Manslaughter*

Defendant contends the trial court denied his federal and state constitutional rights to due process, a fair trial, and the right to present a defense, because the jury instructions on voluntary manslaughter were defective. Defendant contends the jury was erroneously not told (1) imperfect defense of another eliminates malice, and (2) imperfect defense of another can exist where a defendant, acting with conscious disregard for life, *unintentionally* kills in unreasonable defense of another.

As to the first point, we shall conclude it does not matter that the instructions failed to inform the jury specifically that imperfect defense of another would eliminate malice, because the instructions as a whole adequately covered the concept.

As to the second point, we shall conclude there was no error in the CALCRIM instructions.[6]

A. *Instructions Given to Jury*

The trial court instructed the jury:

"[CALCRIM No. 500] Homicide is the killing of one human being by another. Murder and manslaughter are types of homicide. The defendant is charged with murder. Manslaughter is a lesser offense to murder."

"A homicide can be lawful or unlawful. If a person kills with a legally valid excuse or justification, the killing is lawful and he has not committed a crime. If there is no legally valid excuse or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter. You must decide whether the killing in this case was unlawful and, if so, what specific crime was committed."

"[CALCRIM No. 505] The defendant is not guilty of murder or manslaughter if he was justified in killing someone in defense of another. The defendant acted in lawful defense of another if:

"1. The defendant reasonably believed that Robert Fitch was in imminent danger of being killed or suffering great bodily injury;

"2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;

"AND

"3. The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of great bodily injury to Robert Fitch. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a

---

[6] The CALCRIM instructions were amended while this appeal was pending but not in any way that affects the outcome of this appeal.

reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"The defendant's belief that Robert Fitch was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true.

"[No retreat requirement.]

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter."

"[CALCRIM No. 520] The defendant is charged in Count 1 with murder.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant committed an act that caused the death of another person;

"AND

"2. When the defendant acted, he had a state of mind called malice aforethought.

"AND

"3. He killed without lawful excuse or justification.

"There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

"The defendant acted with express malice if he unlawfully intended to kill.

"The defendant acted with implied malice if:

"1. He intentionally committed an act;

"2. The natural consequences of the act were dangerous to human life;

"3. At the time he acted, he knew his act was dangerous to human life;

"AND

"4. He deliberately acted with conscious disregard for human life.

"[Describing malice aforethought and natural/probable consequences.]

"[Distinction between first and second degree murder.]

"[Reduction to voluntary manslaughter for sudden quarrel or heat of passion.]"

The court also instructed the jury on imperfect defense of others (pursuant to CALCRIM No. 571), as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect defense of another.

"If you conclude the defendant acted in complete defense of another, his action was lawful and you must find him not guilty of any crime. The difference between complete defense of another and imperfect defense of another depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in imperfect defense of another if:

"1. The defendant actually believed that Robert Fitch was in imminent danger of being killed or suffering great bodily injury;

"AND

"2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;

"BUT

"3. At least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

"In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect defense of another. If the People have not met this burden, you must find the defendant not guilty of murder."

B. *Analysis*

1. *Legal Principles*

Our standard of review is de novo where the question is one of law involving the determination of applicable legal principles. (*People v. Alvarez* (1996) 14 Cal.4th 155, 217 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

■ A killing is voluntary manslaughter when the defendant, acting with *conscious disregard* for life and the knowledge that the conduct is life-endangering, *unintentionally* kills while having an unreasonable but good faith belief in the need to act in self-defense. (*People v. Blakeley* (2000) 23 Cal.4th 82, 88–91 [96 Cal.Rptr.2d 451, 999 P.2d 675].) A killing is also voluntary manslaughter when the defendant, acting with conscious disregard for life and the knowledge that the conduct is life-endangering, unintentionally but unlawfully kills in a sudden quarrel or heat of passion. (*People v. Lasko* (2000) 23 Cal.4th 101, 108–111 [96 Cal.Rptr.2d 441, 999 P.2d 666].)

■ California recognizes the doctrine of imperfect defense of another. (*People v. Randle* (2005) 35 Cal.4th 987, 994–1001 [28 Cal.Rptr.3d 725, 111 P.3d 987].) One who kills in imperfect defense of another—in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury—lacks malice and is guilty only of manslaughter. (*Id.* at pp. 996–997.)

Under the doctrine of defense of another, reasonableness is tested from the point of view of the defendant, not the point of view of the person being defended. (*People v. Randle, supra,* 35 Cal.4th at pp. 999–1000.) Although some states adopted an "alter ego" rule (under which one who attempts to defend another person steps into the shoes of the other person and so acts at his peril if that person was in the wrong), California applies the view that one coming to the defense of others is protected by the mistake-of-fact doctrine and may act upon the situation as it reasonably seems to be. (*Id.* at pp. 997–1001.)

In *Randle,* the defendant and his accomplice were caught burglarizing a car. (*People v. Randle, supra,* 35 Cal.4th at p. 991.) The defendant and his accomplice fled, but the car owner and a relative (collectively burglary victim) chased them, caught and beat the accomplice, recovered the stolen property, returned to the victim's truck, and then returned to the accomplice and resumed beating him severely. (*Id.* at p. 991.) The defendant pulled out his gun and killed the burglary victim. (*Id.* at p. 992.) The Supreme Court held the trial court prejudicially erred in refusing to instruct the jury on the doctrine of imperfect defense of another. (*Id.* at pp. 1002–1004.) If the defendant killed in the actual but unreasonable belief that he had to defend another from imminent danger of death or great bodily injury, he was guilty of manslaughter, not murder, because he lacked the malice required for murder. In contrast to *self-defense,* which is lost if the defendant creates circumstances justifying his adversary's attack (*In re Christian S.* (1994) 7 Cal.4th 768, 771 [30 Cal.Rptr.2d 33, 872 P.2d 574]), the defendant could invoke the "defense of another" doctrine, even though his own criminal conduct set in motion the series of events that led to the fatal shooting, because the retreat of the defendant and his accomplice and the subsequent recovery of the stolen items extinguished the legal justification for the victim's attack on the defendant's accomplice. (*People v. Randle, supra,* 35 Cal.4th at pp. 1002–1004.) Similarly, *imperfect self-defense* is an available defense when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant. (*People v. Vasquez* (2006) 136 Cal.App.4th 1176 [39 Cal.Rptr.3d 433] [trial court should have instructed the jury on imperfect self-defense where defendant confronted victim with an accusation, the victim began to choke the defendant, and the defendant pulled out a gun and shot the victim].)

2. *Malice*

■ As for defendant's complaint that the jury was not told imperfect defense of another eliminates malice, it does not matter that the CALCRIM instructions failed to inform the jury that imperfect defense of another would

eliminate malice. As we have set forth above, the jury was told, in a series of instructions, what different kinds of acts and situations would reduce the crime from murder to voluntary manslaughter. It is immaterial that the jury was not informed that, in fact, what was going on was that the jury was finding an "absence of malice." As Justice Corrigan has explained in her Preface to the CALCRIM jury instructions, "our work reflects a belief that sound communication takes into account the audience to which it is addressed." (Judicial Council of Cal., Crim. Jury Instns. (2008) Preface, p. xi.) "Malice is another word of multiple meanings in criminal law . . . ." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 11, p. 213.) The definition of malice may be interesting to lawyers and judges and law professors, but it does not aid the task of lay jurors to inform them that, when the defendant acts in an honest but unreasonable belief in the need to defend another, he is acting without malice. Consequently, the CALCRIM instructions are not erroneous in their failure to tell the jury the role that malice (or lack of malice) plays in reducing murder to voluntary manslaughter.

### 3. *Conscious Disregard*

Defendant argues the instructions did not inform the jurors they could find him guilty of voluntary manslaughter if they found that he, while acting in imperfect defense of another (or sudden quarrel or heat of passion), killed either intentionally or unintentionally with conscious disregard for human life.

Either an intent to kill or a conscious disregard for life is an essential requirement of voluntary manslaughter in this scenario. (*People v. Blakeley, supra*, 23 Cal.4th at pp. 88–91; *People v. Lasko, supra*, 23 Cal.4th 101.)

Defendant argues the trial court should have expressly instructed the jury that intent to kill or conscious disregard for life is an essential element of voluntary manslaughter, in accordance with *Blakeley* and *Lasko*, and the failure to do so left the jurors with no way to apply defendant's proffered defense to the elements of express or implied malice to ascertain whether these elements had been proven beyond a reasonable doubt. We disagree.

Thus, although the jury was not expressly instructed in that manner, the jury *was* instructed, "A killing *that would otherwise be murder* is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect defense of another." (Italics added.) Similarly, the jury was instructed, "A killing *that would otherwise be murder* is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion."

The killing could not "otherwise be murder" unless the jury found defendant intended to kill the victim or acted with conscious disregard for human

life, and the jury was so informed in the instruction defining murder (i.e., that to prove murder, the prosecution must prove defendant acted with malice aforethought, and there are two kinds of malice aforethought—express, which requires intent to kill, and implied, which requires conscious disregard for human life).

Thus, the instructions did let the jury know that a killing in imperfect self-defense (or heat of passion, etc.), whether intentional or in conscious disregard of life, is voluntary manslaughter.

Defendant argues the language, "killing that would otherwise be murder," was faulty for failing to inform the jury that voluntary manslaughter could be found despite the existence of an intent to kill or conscious disregard for life. This argument is not well taken. Defendant says intent to kill or conscious disregard for life used to be expressly stated as an essential element of voluntary manslaughter in former CALJIC No. 8.40, which defined voluntary manslaughter and said that every person who unlawfully kills another human being without malice aforethought but either with an intent to kill, or with conscious disregard for human life, was guilty of voluntary manslaughter. Language similar to former CALJIC No. 8.40 now appears in CALCRIM No. 572, which defines voluntary manslaughter when murder is not charged. (CALCRIM No. 572.) Here, voluntary manslaughter was a lesser offense of murder. Defendant argues that, since no instruction tracking former CALJIC No. 8.40 was given in this case, once the jury determined that express or implied malice was present in defendant's case, they were given no instructions telling them that *even if* they found this to be true, they could still find defendant guilty of voluntary manslaughter if they believed he acted in heat of passion or in reasonable/unreasonable defense of Bob Fitch. But defendant's argument is defeated by the plain language of the instructions as given to the jury, that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter" if defendant acted in imperfect defense of another or sudden quarrel or heat of passion.

We conclude there was no error in the jury instructions on voluntary manslaughter.

II. *Modified CALCRIM Nos. 3471 and 3472*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

\*See footnote, *ante*, page 817.

## DISPOSITION

The judgment is affirmed.

Raye, J., and Hull, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 25, 2009, S169524.