Filed 4/10/26  P. v. Sanchez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE LUIS SANCHEZ,<br><br>    Defendant and Appellant. | H052590<br>(Santa Clara County<br> Super. Ct. No. C1907724) |

A jury found Jose Luiz Sanchez guilty of two counts of first degree murder and one count of discharging a firearm from a motor vehicle, with enhancements and a special circumstance found true.  On appeal, Sanchez asserts that the trial court's incorrect instruction on the requisite mental state for voluntary manslaughter constituted prejudicial error and violated his constitutional rights.  We reject his claim for the reasons explained below and affirm.[1]

## I.    FACTS AND PROCEDURAL BACKGROUND

On the evening of May 16, 2018, Emilio Salazar drove himself and two friends, Jennifer Martinez and Francis Alfaro, into the San Jose foothills to observe the cityscape.  The group parked alongside the cliffside of Sierra Road to "hang out," drink alcohol, and

_____

[1] Sanchez also petitions for a writ of habeas corpus challenging his conviction in this matter.  (*In re Jose Luis Sanchez*, H053380.)  We have disposed of the habeas petition by separate order filed this day.  (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

dance to music outside of the car.  On the opposite side of the two-lane road, two or three cars were parked alongside the corniche.  Salazar was drinking from a bottle, dancing in the street and "just vibing."  While dancing, Salazar put his hands in the air and made a "G" sign with his fingers.

At that moment, Sanchez and three others, Michelle Cardenas, Eduardo Saldana, and Laiza Castillo, drove past Salazar's group in a Honda Accord that had been reported stolen earlier that month.  Sanchez was in the driver's seat, Castillo sat in the front passenger seat, and Cardenas and Saldana sat in the back seat.  Everyone inside the Honda was intoxicated and at least Sanchez and Saldana had used cocaine.  Cardenas testified that she believed Salazar made a hand gesture "shaped as a gun," and mentioned it to the other occupants of the car.  Saldana saw people "banging and stuff like that."  He also saw a man holding his hand out like a gun and holding his pants up "like he had something," but he did not mention anything to the other passengers.

After hearing Cardenas's comments, Sanchez made a U-turn and headed back toward Salazar's group.  Cardenas testified that Sanchez did not turn around "right away but, like, thought about it, and then turned."  Sanchez pulled up about 25 feet behind Salazar's car and parked on the same side of the road without turning off the engine.  Salazar and Martinez, who were both wearing black hoodies, walked over to the car while Alfaro waited by Salazar's car.  Salazar and Martinez approached the driver's side window, which was open.  Salazar was close enough to the car that he would have been able to reach out and touch the driver's side door.  Salazar and Martinez kept their hands at their side, and neither pointed a finger at anyone.  Salazar, and Martinez, started a conversation with Sanchez.  Sanchez was the only person in the car who spoke to the pair.  No one was screaming, and neither Salzar nor Martinez threw any punches or kicked Sanchez's car.

Less than a minute after Salazar and Martinez approached the car, Sanchez pulled out a .45 caliber semi-automatic firearm and rapidly fired multiple gunshots at them.

2

Salazar and Martinez ran away from the car to get away from the gunfire. Sanchez stopped shooting after Salazar and Martinez fell to the ground in the middle of the road and drove off immediately thereafter. Following the shooting, Cardenas reported that Sanchez mentioned he had seen one of the victims "trying to pull something out" and stated either "[i]t was either them or us" or "[b]efore they shoot me I'm going to shoot them." Cardenas testified that she was "shocked" by the sudden gunfire.

Once Sanchez left, Alfaro ran to the two victims and screamed for help. A bystander who was parked nearby observed the incident and called 911. Both victims died at the scene. No weapons were found on either victim's person or anywhere else at the scene of the shooting. An autopsy later revealed that Salazar and Martinez each sustained four gunshot wounds. Salazar was shot once in the chest, twice in the left back, and once through the back of his left arm. Martinez was shot once through the chest to her spine, once through the abdomen with a bullet that did not exit her body, through the left buttock with an exit wound in the abdomen, and through the back of her left wrist, fracturing the forearm bones. Salazar's postmortem toxicology report indicated that he had a blood alcohol level of .101, with methamphetamine, and a metabolite of marijuana detected as well. Martinez's toxicology report indicated that she had a blood alcohol level of .167, with evidence of methamphetamine and a metabolite of marijuana.

Some days after the shooting, a Santa Clara Police Department patrol officer stopped a car in an unrelated incident. Sanchez was the driver. The officer recovered a semi-automatic .45 caliber Fabrique National firearm from the front passenger floorboard. Subsequently, a criminalist compared .45 auto caliber cartridge cases recovered from the homicide scene and projectiles from the victims' bodies to .45 auto cartridge cases and bullets that were test fired from the gun recovered from the car detained by the Santa Clara police. The criminalist concluded that the bullets and projectiles were fired from the Fabrique National firearm recovered during the auto detention.

The Santa Clara County District Attorney filed an amended information charging Sanchez with two counts of first degree murder (Pen. Code, § 187, subd. (a))[2] with special circumstances for committing more than one murder (§ 190.2, subd. (a)(3)), discharging a firearm from a motor vehicle (§ 26100, subd. (c)), and unlawful driving or taking of a vehicle (Veh. Code, § 10851, subd. (a)). The information further alleged three enhancement allegations for personal and intentional discharge of a firearm (§ 12022.53, subd. (d)), and that Sanchez had suffered a prior strike (§§ 667, subds. (b)-(i), 1170.12) as well as a prior serious felony conviction (§ 667, subd. (a)).

At trial, the prosecutor argued Sanchez was guilty of first degree murder because the murder was either: (1) willful, deliberate, and premeditated; (2) committed by lying in wait; and/or (3) committed by shooting from a motor vehicle. The prosecutor also asserted that Sanchez did not act in self-defense, in imperfect self-defense, or under the heat of passion when he shot the victims because he was not sufficiently provoked and neither victim did anything that would have "caused a reasonable person, an objective person in the same situation to do what [Sanchez] did."

Defense counsel claimed that Sanchez committed justifiable homicide in self-defense because he reasonably believed he was in danger when he shot Salazar and Martinez. Defense counsel highlighted evidence that Cardenas told Sanchez she saw a man making a hand gesture in the shape of a gun with his fingers as they drove past the group, the area was dark and secluded, and two people—including the person who made the hand gun gesture—immediately approached the car when Sanchez stopped near them. Both people were wearing dark hoodies and Cardenas recalled Sanchez stating, "[b]efore they shoot me I'm going to shoot them." Alternatively, defense counsel argued that if the jury found Sanchez honestly believed he needed to defend himself but acted

---

[2] Unspecified statutory references are to the Penal Code.

4

unreasonably, he was, at most, guilty of voluntary manslaughter under an imperfect self-defense theory.

The jury found Sanchez guilty as charged and found true the special circumstance and the firearm enhancement allegations. Sanchez waived his right to a jury trial on the prior conviction allegations and in a bifurcated proceeding, the trial court found the allegations true. The trial court sentenced Sanchez to two consecutive terms of life without the possibility of parole for each count of first degree murder, consecutive to two terms of 25 years to life for the attendant firearm allegations, and four years for taking a motor vehicle (doubled under the "Three Strikes" law). The trial court struck the prior serious conviction enhancement. The sentences for the remaining counts were imposed and stayed pursuant to section 654.

Sanchez timely appealed.

## II. DISCUSSION

Sanchez contends the trial court's instruction concerning the concurrence of act and intent (CALCRIM No. 252) did not correctly reflect the mental state required for voluntary manslaughter. He claims the instructional error was prejudicial because it lowered the prosecution's burden of proof and violated his constitutional rights. The Attorney General counters that Sanchez forfeited his claim by failing to raise a timely and specific objection to the instruction or request that the trial court modify CALCRIM No. 252. In the alternative, the Attorney General asserts that Sanchez's claim fails on the merits and even if the instruction was incorrect, any error was harmless.

We reject the Attorney General's claim that Sanchez forfeited his claim and agree with Sanchez that the trial court misstated the law on the requisite mental state for voluntary manslaughter in instructing the jury with CALCRIM No. 252. However, we conclude the instructional error was harmless and therefore affirm.

5

**A.** *Standard of Review*

"An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 (*Ramos*).) "In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585; *Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

**B.** *Forfeiture*

Preliminarily, we address the Attorney General's assertion that Sanchez forfeited any claim of instructional error by failing to object in the trial court. "Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court. [Citations.] The rule of forfeiture does not apply, however, if the instruction was an incorrect statement of the law [citation], or if the instructional error affected the defendant's substantial rights. [Citations.]" (*People v. Franco* (2009) 180 Cal.App.4th 713, 719 (*Franco*).) Because Sanchez maintains that the challenged instruction is not a correct statement of law, we may address his claim despite his failure to object.

**C.** *Instruction on the Union of Act and Intent*

Turning to the merits, Sanchez contends CALCRIM No. 252, as given here, misstated the law because voluntary manslaughter is not only a general intent crime but can also be committed when the defendant acts with specific intent to kill.

1. Additional Background

The trial court instructed the jury pursuant to CALCRIM No. 252, in pertinent part, as follows: "The crimes or other allegations charged in Counts 1 through 4 require

6

proof of the union, or joint operation, of act and wrongful intent. [¶] The following allegations require general criminal intent: . . . *Voluntary Manslaughter, the lesser offense of Counts One and Two*. . . . For you to find the[] allegation[] true, that person must not only commit the prohibited act, but must do so with *wrongful intent*. A person acts with wrongful intent when he intentionally does a prohibited act; however, it is not required that he intend to break the law. The act required is explained in the instruction for that crime or allegation. [¶] All four charged crimes and the lesser included crime of Second Degree Murder for Counts 1 and 2 and the special circumstance allegation require specific intent or mental state. For you to find person guilty of these crimes or to find the allegation true, that person must not only intentionally commit the prohibited act, but must do so with specific intent and\or mental state. The act and the specific intent and\or mental state required are explained in the instruction for each individual crime and the special circumstance allegation. (See Instruction Numbers 500, 520, 521, 968, 1820 and 721)." (Italics added.)

As relevant here, the jury was also instructed with the pattern jury instructions on murder (CALCRIM No. 520), first degree murder (CALCRIM No. 521), self-defense (CALCRIM No. 505), and voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571).

Sanchez argued at trial that he was not guilty of murder because he acted in self-defense, or, if the jury concluded he had an actual but unreasonable need to defend himself, that he was guilty of manslaughter based on a theory of imperfect self-defense.

### 2. Legal Principles

"In criminal law, there are two descriptions of criminal intent: general intent and specific intent. 'A crime is characterized as a "general intent" crime when the required mental state entails only an intent to do the act that causes the harm; a crime is characterized as a "specific intent" crime when the required mental state entails an intent to cause the resulting harm.' [Citation.] 'General criminal intent thus requires no further

mental state beyond willing commission of the act proscribed by law.' [Citation.]" (*People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1172-1173.)

"California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter." (*People v. Rios* (2000) 23 Cal.4th 450, 460 (*Rios*).) Murder is the unlawful killing of a human being. . . with malice aforethought. (§ 187, subd. (a).) Malice may either be express or implied. (§ 188, subd. (a).) "It is express when the defendant manifests 'a deliberate intention unlawfully to take away the life of a fellow creature.' [Citation.]" (*People v. Lasko* (2000) 23 Cal.4th 101, 107.) Malice is implied when the defendant intentionally commits an act, the natural consequences of the act were dangerous to human life, the defendant knew that the conduct endangered the life of another, and the defendant deliberately acted with conscious disregard for human life. (*People v. Bryant* (2013) 56 Cal.4th 959, 965.)

Voluntary manslaughter is a lesser included offense of murder and "can be committed either with an intent to kill [specific intent] or with conscious disregard for human life [general intent]." (*People v. Martinez* (2007) 154 Cal.App.4th 314, 336-337 (*Martinez*).) A defendant who commits an intentional and unlawful killing is guilty of the lesser included offense of voluntary manslaughter "only in limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion' [citation], or when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense [citations]." (*People v. Barton* (1995) 12 Cal.4th 186, 199; *People v. Blakeley* (2000) 23 Cal.4th 82, 87-88.) Provocation and imperfect self-defense "reduce . . . murder to voluntary manslaughter 'by *negating the element of malice* that otherwise inheres in such a homicide [citation].' [Citation]." (*Rios*, *supra*, 23 Cal.4th at p. 461.)

The trial court is required "to instruct on all of the elements of a charged offense [citations], including the mental state required to commit the offense and the union of that

mental state and the defendant's act [citations]." (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1160.) Failure to do so is error. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 219-220 [concluding the trial court erred by omitting murder as a specific intent crime in its concurrence instruction]; see also *People v. Saavedra* (2018) 24 Cal.App.5th 605, 615 (*Saavedra*) [trial court erred by instructing the jury that a general intent crime was a specific intent crime].)[3]

### 3. Analysis

Here, by instructing the jury with CALCRIM No. 252 as described above, the trial court misstated the law regarding the concurrence of act and intent for the commission of voluntary manslaughter because the trial court failed to instruct the jury that the offense can be committed with the intent to kill *or* with conscious disregard for life. We must therefore determine whether the instructional error was prejudicial.

Courts have differed regarding what standard of prejudice applies to a trial court's erroneous instruction on concurrence of act and intent. (Compare *People v. ZarateCastillo* (2016) 244 Cal.App.4th 1161, 1168-1169 [holding the trial court's error in listing specific intent crimes—sexual penetration of a child 10 years of age or younger and forcible sexual penetration—as general intent crimes under CALCRIM No. 252, was harmless under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)]; with *Martinez, supra*, 154 Cal.App.4th at p. 337 [concluding that even if the trial court's concurrence instruction on voluntary manslaughter misled the jury into believing that specific intent is always required to prove manslaughter, the error was harmless under

---

[3] In *People v. Canales* (2024) 106 Cal.App.5th 1230 (*Canales*), the appellate court noted that the terms "general intent" and "specific intent" have been deemed ambiguous and widely criticized and expressed its view that CALCRIM No. 252 could be improved by eliminating the terminology. (*Canales*, at pp. 1252-1256; see *People v. Hood* (1969) 1 Cal.3d 444, 456 ["[s]pecific and general intent have been notoriously difficult terms to define and apply"]; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1126-1127 ["The division of crimes into two categories, one requiring 'general intent' and one 'specific intent,' is both simplistic . . . and potentially confusing"].)

*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)]; see also *People v. Hardy* (2018) 5 Cal.5th 56, 97 [applying "reasonable likelihood" standard to trial court's concurrence instruction and concluding any error in listing torture as a specific intent crime rather than a general intent crime was harmless].) We need not resolve this conflict because we conclude the instructional error here was harmless under either standard of review. (*Canales*, *supra*, 106 Cal.App.5th at p. 1251; *Saavedra*, *supra*, 24 Cal.App.5th at p. 615.)

We "interpret the instructions to support the judgment rather than to defeat it" when reasonably possible. (*Franco*, *supra*, 180 Cal.App.4th at p. 720.) We conclude that any confusion caused by the trial court's error in describing voluntary manslaughter solely as a general intent crime in CALCRIM 252 was minimal given other instructions provided to the jury. The trial court properly instructed the jury with CALCRIM No. 520 which states that murder requires a "state of mind called malice aforethought," which can be express or implied, and properly explained that malice is express when the defendant "unlawfully intended to kill" and implied when he "act[s] with conscious disregard for human life." The trial court also instructed the jury with CALCRIM No. 571 that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another." "A killing could not 'otherwise be murder' unless the jury found [Sanchez] intended to kill the victim[s] or acted with conscious disregard for human life." (*People v. Genovese* (2008) 168 Cal.App.4th 817, 831-832.) We are not persuaded that Sanchez was prejudiced by the omission in CALCRIM No. 252. The other instructions accurately informed the jury of the mental states applicable to voluntary manslaughter. Further, we presume that jurors are intelligent and capable of understanding and correlating the jury instructions. (*Ramos*, *supra*, 163 Cal.App.4th at p. 1088.)

Moreover, the prosecutor informed the jury during closing argument that malice aforethought for murder can be express or implied and argued that Sanchez's actions fell under "both" theories of malice. The jury was also explicitly instructed that the

10

prosecution had "the burden of proving beyond a reasonable doubt that [Sanchez] was not acting in imperfect self-defense," (CALCRIM No. 571) and both the prosecutor and defense counsel repeatedly emphasized this point during closing argument. The instructions as a whole, together with counsels' arguments, explained to the jury that voluntary manslaughter can be committed with intent to kill *or* with conscious disregard for human life and that the prosecution bore the burden of proof on that issue. (See *Franco*, *supra*, 180 Cal.App.4th at p. 720 [review of instructional error claim requires an appellate court to consider "the instructions as a whole and the entire record of trial, including the arguments of counsel"].) Thus, contrary to Sanchez's contention, based on the instructions given, the jury was able to assess whether Sanchez committed voluntary manslaughter based on imperfect self-defense if the jury also concluded that Sanchez shot the victims with specific intent to kill.

The prosecution's case that Sanchez committed murder, and was acting neither in self-defense nor imperfect self-defense when he shot the victims, was strong. The evidence indicated that after Cardenas stated she saw someone making a gesture with their fingers resembling a gun, Sanchez did not turn the car around immediately. Rather, Cardenas testified that Sanchez "thought about it" for a few seconds "and then turned [around]." Sanchez then made a U-turn and parked a few feet behind Salazar's group without turning off the car engine. As Sanchez exchanged words with the two victims, none of the witnesses reported hearing any dispute or argument. Less than a minute after the victims approached the car, Sanchez pulled out his gun, fired several shots at the two victims from close range, and continued to shoot them even as they turned and fled from him. Finally, Sanchez's claim that he shot to protect himself conflicted with the other evidence in this case given Cardenas testified that she was "shocked" by the sudden gunfire, no witnesses reported seeing a weapon in either victim's hands, and no weapons were found on or near the victims following the shooting.

11

Viewing the instructions as a whole, the evidence the jury considered, and counsels' arguments, we conclude that the trial court's failure to include voluntary manslaughter in the list of specific intent crimes under CALCRIM No. 252 was harmless beyond a reasonable doubt.  (*Chapman*, *supra*, 386 U.S. 18 at p. 24.)  For the same reasons, it is also not reasonably probable that Sanchez would have obtained a more favorable outcome absent the instructional error.  (*Watson*, *supra*, 46 Cal.2d at p. 836.)

## III.    DISPOSITION

The judgment is affirmed.

_____
Greenwood, P. J.

WE CONCUR:


_____
Danner, J.




_____
Bromberg, J.



H052590 People v. Sanchez