Filed 5/14/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B338493 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. LA090215 |
| v. | |
| STEVEN J. WILMOT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory A. Dohi, Judge. Judgment vacated and case remanded.

Christopher A. Muller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

The trial court added its own paragraph to a CALCRIM jury instruction. This modification created prejudicial legal error. We vacate the judgment of conviction and remand for a new trial.

The jury convicted Steven Wilmot of the second degree murder of Franklin Washington. The added modification told the jury that, "If you find that Mr. Wilmot <u>unintentionally</u> killed Mr. Washington because of a sudden quarrel or in the heat of passion . . . , you may find him guilty of voluntary manslaughter." The court underlined the added word "unintentionally." The reasonable interpretation of this word, in context, is that the jury should *not* find Wilmot guilty of mere voluntary manslaughter if jurors believed Wilmot *intentionally* killed Washington in the heat of passion. It was a mistake, however, to suggest Wilmot's action had to be "<u>unintentional</u>." This instruction incorrectly choked off Wilmot's access to the lesser offense of manslaughter.

We independently review Wilmot's claim of instructional error. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) In assessing the facts, we consider Wilmot's testimony. (Cf. *People v. Campbell* (2020) 51 Cal.App.5th 463, 501 [when reviewing a failure to instruct on a lesser included offense, we view evidence in the light favorable to the defense].)

I

Wilmot's job was handing out business cards near the Van Nuys police station for a bail company. Friends and family visiting arrestees locked up at the station might be interested in bail information. They were Wilmot's targets. His prime work hours were at night, when arrests peaked.

The episode here was a fateful six-minute series of encounters. It began at 3:44 a.m. and ended at 3:50 a.m.

At 3:44 a.m., Wilmot was roaming on his business card circuit when he spied Washington in a tent on the street. Wilmot had a bone to pick with Washington. Wilmot approached.

The interaction between Wilmot and Washington would proceed in three stages. Soundless videos from nearby cameras enabled the jury to time movements exactly. We describe events and then recount Wilmot's testimony about what he claimed the two said to each other at each stage.

From a considerable distance, the silent videos show Wilmot approaching Washington's tent and then departing about a minute later. About four minutes after that, Wilmot returns. After about 18 seconds, Wilmot runs away. Wilmot sprints back to Washington some 30 seconds later: he dashes up to Washington, immediately stabs him in the chest, and runs away again.

Wilmot told the jury about the words the two men supposedly exchanged.

When he first approached, Wilmot told Washington that some "meth" Wilmot earlier bought from Washington had turned out to be "fake." Wilmot demanded Washington refund his $50 or replace the "bunk shit" with "good meth." Wilmot said, "Give me my money back or some good crystal."

Washington first told Wilmot to wait until Washington served a bicyclist who just then pedaled up to Washington's tent. Wilmot departed for about four minutes. He crossed the street and disappeared from camera view, but about four minutes later he returned to renew his demands.

Now Washington was hostile and threatening. According to Wilmot, Washington said, "You better get the fuck out of my face before I put a hole in you, mother fucker." Wilmot said,

3

"Give me my fucking money back, you scamming bitch." Washington responded, "I'm going to fucking kill you, bitch. . . . Don't let me catch you around, mother fucker."

Wilmot knew Washington was a violent person. Wilmot also testified Washington at this moment was threatening him with a metal object Wilmot believed was a knife. After about 18 seconds, Wilmot ran from the scene and again disappeared from the cameras' view.

The confrontation came to a head 30 seconds later when Wilmot returned at a running pace and charged towards Washington.

Wilmot described to the jury his mental state at that moment: it was *anger* and *fear*. The *anger* stemmed from Washington's refusal to make good on the fake meth deal and his peremptory command to abandon Wilmot's work turf. The *fear* arose because Wilmot knew Washington was prone to violence, had brandished a knife, and was threatening to kill him.

Wilmot said he thrust his open pocket knife towards Washington's torso "to injure him."

According to Wilmot, Washington at that moment was moving backwards, saying "Bring it on mother fucker. Bring it on mother fucker. Bring it on mother fucker. He kept saying that."

Wilmot testified "I thought he was going to pull a weapon out after he gave me that face, that vicious look and we locked eyes. I thought he was going to pull a weapon or something out and kill me."

Wilmot testified he had no idea his single knife jab could be fatal, for Washington was wearing "a big leather jacket." Wilmot said he was stunned to learn his blade fatally pierced

Washington's heart:  he claimed he had no intention of killing Washington.  Wilmot told the jurors "I regret what I did."  "My action," Wilmot said, had been "too fast."

The prosecution charged Wilmot with murder.  The jury acquitted him of first degree murder but convicted him of second degree murder.  The sentence was fifteen years to life.

The trial court and the attorneys discussed jury instructions after the close of evidence.  The court decided to give the then-current version of CALCRIM No. 570, which the court said it would modify based on the decision in *People v. Lasko* (2000) 23 Cal.4th 101 (*Lasko*).  (The then-current version of the CALCRIM instruction is, for our purposes, substantially the same as the current version.)

CALCRIM No. 570 is entitled "Voluntary Manslaughter: Heat of Passion—Lesser Included Offense (Pen. Code, § 192(a))."

The court modified CALCRIM No. 570 by adding a paragraph to the instruction.  In the copy given to the jury, the court underlined one word in this new paragraph: "<u>unintentionally</u>."  In the rest of the instructions, covering some 34 pages, no other word bore this emphasis.

We reproduce this added paragraph verbatim:

"If you find that Mr. Wilmot <u>unintentionally</u> killed Mr. Washington because of a sudden quarrel or in the heat of passion as I've defined those terms, or, as I'll define later, in an honest but unreasonable belief in self-defense, you may find him guilty of voluntary manslaughter."

## II

The trial court's modification inadvertently introduced error into the instruction, for it implied that jurors should *not* find Wilmot guilty of voluntary manslaughter if they believed he

5

*intentionally* killed Washington. This implication is contrary to law: an intentional killing in the heat of passion can indeed be voluntary manslaughter.

The *Lasko* opinion—the case on which the trial court relied—is a controlling authority. It held defendants can qualify for voluntary manslaughter if they killed intentionally. (*Lasko, supra,* 23 Cal.4th at p. 104.)

To introduce the vague concept of "unintentional" into the correct and precisely-worded text of CALCRIM No. 570 was error. Without supporting context, "unintentional" is an ambiguous word because it has different meanings. This ambiguity is mischievous in a legal field where precision is crucial. It caused mischief here.

For instance, a purely blameless killing can be "unintentional." In that situation, there is no crime at all. (E.g., Pen. Code, § 26 [no criminal liability when a person's action is the result of "misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence"], § 195, subd. 1 [homicide is excusable when "committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent"].)

We offer a standard example of an unintentional killing that would be blameless. A killing would not be a crime if a driver struck a runner who suddenly darted into traffic. If the driver were obeying all traffic laws and the runner left no time for the driver to react, the driver would be blameless. The killing would be an accident. It would be "unintentional."

This "unintentional" state of mind is entirely different from the "unintentional" mental state that was the sole focus of the

6

*Lasko* case.  We review the *Lasko* decision and the precedents that form its context.

Louis Lasko told jurors he hit Don Fitzpatrick in the head with a bat.  (*Lasko, supra,* 23 Cal.4th at pp. 105–106.)  Lasko claimed he was merely trying to defend himself from Fitzpatrick's attack.  (*Ibid*.)  The jury convicted Lasko of second degree murder.  (*Id.* at p. 106.)  The Supreme Court agreed with Lasko that a CALJIC instruction the trial court gave was legally erroneous because it stated that, to find Lasko guilty of voluntary manslaughter, jurors had to find the killing was done with "the intent to kill."  (*Id.* at p. 107.)  This was incorrect, the high court held.  (*Id.* at pp. 111–113.)  Exactly why requires careful explanation.

The *Lasko* court held that requiring an "intent to kill" was too restrictive because voluntary manslaughter also encompasses killings committed in the heat of passion when the defendant's mental state is "conscious disregard for life."  (*Lasko, supra,* 23 Cal.4th at p. 107.)  The *Lasko* court equated this "conscious disregard for life" state of mind with recklessness.  (See *id.* at p. 110 ["recklessly"], *id.* at p. 111 ["very reckless (depraved heart) conduct," citing 2 LaFave, Substantive Criminal Law (1986) § 7.10, p. 253].)

The *Lasko* opinion noted the Ninth Circuit agreed that a defendant who, in the heat of passion, killed *recklessly* with extreme disregard for human life could be guilty of voluntary manslaughter rather than murder.  (*Lasko, supra,* 23 Cal.4th at p. 111, citing *U.S. v. Paul* (9th Cir.1994) 37 F.3d 496, 499, fn. 1.)

The *Lasko* decision was consistent with earlier Supreme Court case law equating "conscious disregard for life" with "recklessness."  (See *People v. Clark* (2016) 63 Cal.4th 522, 617 &

fn. 73 (*Clark*).) "The Model Penal Code generally defines acting recklessly as follows: 'A person acts *recklessly* with respect to a material element of an offense when he *consciously disregards a substantial and unjustifiable risk* that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' (Model Pen.Code, § 2.02, subd. (2)(c).)" (*Clark, supra,* 63 Cal.4th at p. 617, emphasis added; see also *id.* at p. 616 [the phrase "reckless indifference to human life" is equivalent to "reckless disregard for human life"].)

"[B]oth the common law and Model Penal Code recognized this reckless indifference to the value of human life can be 'every bit as shocking in the moral sense as an "intent to kill." ' . . . [I]n the common law, intentional killing is not the only basis for establishing the most egregious form of criminal homicide.... For example, the Model Penal Code treats reckless killing, "manifesting extreme indifference to the value of human life," as equivalent to purposeful and knowing killing.' " (*Clark, supra,* 63 Cal.4th at p. 616, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 157.)

The high court also equated "conscious disregard for life" with "reckless conduct" in *People v. Bryant* (2013) 56 Cal.4th 959, 968 [citing 2 LaFave, Substantive Criminal Law (2d ed. 2003) § 15.2(a), p. 493].

In line with this precedential tradition, the *Lasko* court included recklessness—which is to say conscious disregard for human life—as a mental state that would allow a jury to reduce

8

murder to manslaughter upon a sufficient showing of provocation.

In substance, then, the *Lasko* decision placed recklessness in the precise hierarchy of the four mental states of purpose, knowledge, recklessness, and negligence. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 173 (*Cel-Tech*) [the Model Penal Code has "defined four distinct culpable mental states": purpose, knowledge, recklessness, and negligence]; see Model Pen. Code, §§ 2.01, 2.02.)

The *Lasko* court said nothing about blamelessly accidental killings. The *Lasko* court did not broach that subject, for defendant Lasko did not claim he hit Fitzpatrick with the bat by accident. The *Lasko* court certainly did not hold that a blameless state of mind was necessary before a jury could find Wilmot guilty of voluntary manslaughter instead of murder. Yet that was the unfortunate implication of the paragraph the trial court added to CALCRIM No. 570 here.

The added paragraph thus was legal error. By unduly narrowing the circumstances under which the jury could convict Wilmot of voluntary manslaughter, the instruction incorrectly restricted the jury's latitude to rule in Wilmot's favor in his bid for the lesser offense of voluntary manslaughter.

The prosecution makes several unsuccessful efforts to defend the verdict.

Initially, the prosecution argues Wilmot forfeited his argument about the instruction. This argument fails. (See *People v. Buenrostro* (2018) 6 Cal.5th 367, 428 [incorrect instruction reviewable notwithstanding failure to object].)

The prosecution argues four other instructions corrected the error introduced by the faulty paragraph. But these four other instructions did not fix the problem, as we explain.

First, the definition of murder in CALCRIM No. 520 stated one element of murder was that the defendant either (1) must have unlawfully intended to kill or (2) must have (a) intentionally committed the act (b) when the natural and probable consequences of the act were dangerous to human life and, (c) at the time he acted, he knew his act was dangerous to human life, and (d) the defendant deliberately acted with conscious disregard for human life. This basic definition of murder, however, said nothing about the topic of voluntary manslaughter, or about the circumstances that could reduce murder to that lesser offense. This instruction did not cure the error.

The second, third, and fourth jury instructions did no better. According to the prosecution, these other instructions were as follows. One instruction specified that a "killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion." Another informed the jury that "[p]rovocation . . . may reduce a murder to manslaughter," and directed the jury to "consider the provocation in deciding whether the defendant committed murder or manslaughter." The final one explained the prosecution bore the burden of proving beyond a reasonable doubt that Wilmot did not kill as the result of a sudden quarrel or in the heat of passion.

These other instructions did not fix the problem. None addressed whether, for purposes of reducing the offense to voluntary manslaughter, an intentional killing is to be treated the same as an unintentional killing.

The instructional error thus was real and unremedied. No other instruction ameliorated it.

As Wilmot notes, the prosecution does not contend the error was harmless. We accept the prosecution's implicit concession on this point, because substantial evidence obviously did support a possible finding Wilmot killed Washington in the heat of passion with at least a reckless state of mind. As noted, Wilmot testified he angrily stabbed Washington's torso to injure him. The jury could have accepted Wilmot's claim that he did not have the *purpose* of killing Washington, and that he did not even *know* his knife thrust would kill Washington. (Cf. *Cel-Tech, supra,* 20 Cal.4th at p. 173 ["Persons act 'purposely' with respect to a result if it is their 'conscious object' to cause that result. (Model Pen.Code, § 2.02(2)(a)(i).) Persons act 'knowingly' with respect to a result if they are 'practically certain' their conduct will cause that result. (Model Pen.Code, § 2.02(2)(b)(ii))"].)

Substantial evidence supported a possible jury finding that Wilmot's state of mind was *recklessness.* Indeed, this case would be a classic case of reckless conduct—if the jury had fully accepted Wilmot's version of events, including his claim that he meant only "to injure him." A jury then could infer Wilmot *consciously disregarded a substantial and unjustifiable risk* that stabbing Washington's chest could cause death. The jury could find that risk was of such a nature and degree that, considering the nature and purpose of Wilmot's conduct and the circumstances known to him, his disregard involved a gross deviation from the standard of conduct that a law-abiding person would observe in Wilmot's situation. (See *Clark, supra,* 63 Cal.4th at p. 617.)

11

If the jury made these findings, Wilmot's act would constitute textbook reckless homicide. Of course, jurors also could reject Wilmot's claims as self-serving and unbelievable, and find that he had the purpose or at least the knowledge that the knife stab would kill Washington. But the facts allowed the potential for a finding of reckless homicide, and it was this potential that the erroneous paragraph closed off. Under *Lasko*, that was error.

The prosecution does not argue Wilmot experienced too little anger to count. Nor does it claim that, as a matter of law, he had time to cool off. In short, Wilmot's testimony constituted substantial evidence of prejudice, because a properly instructed jury that accepted Wilmot's testimony could have convicted him of manslaughter instead of murder.

The prosecution repeatedly cites *People v. Genovese* (2008) 168 Cal.App.4th 817, 831–832 (*Genovese*), which is not on point. The *Genovese* case did not involve an instruction that suggested jurors could reduce murder to manslaughter *only* if they found the killing was "<u>unintentional</u>." *Genovese* is irrelevant.

Lastly, the prosecution unsuccessfully contends the defense counsel's closing argument rescued the prosecution's case. The defense attorney did state, "It doesn't matter whether Mr. Wilmot intentionally or unintentionally killed Mr. Washington." But the court gave the standard admonition that jurors must ignore arguments by lawyers that contradicted jury instructions. The instructions thus trumped the argument, meaning the lawyer's argument did not rectify the instructional error.

//

//

//

12

## DISPOSITION

We vacate the judgment of conviction and remand the case for further proceedings.


WILEY, J.


We concur:


STRATTON, P. J.


VIRAMONTES, J.

13